UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| United States of America; *ex rel.* KARI CRUTCHER, | Civil Action No. 16-CV-03812-SCJ |
| Plaintiff, | |
| v. | |
| FIRST GUARANTY MORTGAGE CORPORATION, | |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, | |
| PIMCO INVESTMENTS LLC, | |
| AARON SAMPLES, | |
| ANDREW PETERS | |
| JILL WINTERS, | |
| and SUZY LINDBLOM. | |
| Defendants. | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS PACIFIC INVESTMENT MANAGEMENT COMPANY LLC'S AND PIMCO INVESTMENTS LLC'S MOTION TO DISMISS AND CROSS-MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

Plaintiff-Relator Kari Crutcher, by and through undersigned counsel,

respectfully submits its Response in Opposition to Defendants Pacific

Investment Management Company LLC's and PIMCO Investment LLC's

Motion to Dismiss and Cross-Motion for Leave to File a Second Amended

Complaint. Plaintiff-Relator's proposed Second Amended Complaint is

attached to this motion.

Plaintiff-Relator respectfully requests that the Court grant the motion, based on the grounds and authorities in the following Response in Opposition to Defendants Pacific Investment Management Company LLC and PIMCO Investment LLC's Motion to Dismiss and Cross-Motion for Leave to File a Second Amended Complaint.  In short, Plaintiff-Relator's allegations suffice to state a claim under Rule 12(b)(6) and meets all requisite pleading standards under Rule 9(b).  Additionally, Plaintiff-Relator has not failed to join a party, and neither her Amended Complaint nor her proposed Second Amended Complaint are deficient under Rule 19.  Plaintiff-Relator has also motioned for leave to amend in a manner permitted under Rule 15.

Plaintiff-Relator respectfully requests that this Court deny Defendant's Motion to Dismiss and grants Plaintiff-Relator's cross-motion to amend, and to grant any such relief as the Court deems just and proper.

Respectfully submitted,

*/ s/ Jonathan W. Ferris*

J. Nelson Thomas, Esq. (admitted *pro hac vice*)
Jonathan W. Ferris, Esq. (admitted *pro hac vice*)
**THOMAS & SOLOMON LLP**
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@ theemploymentattorneys.com
jferris@theemploymentattorneys.com

-and-

Samuel J. Buffone, Jr. (*Pro hace vice* application forthcoming)
Michael DeJesus
**Black & Buffone PLLC**
1400 Eye St. NW
Suite 200
Washington, D.C. 20005
Telephone: (202) 997-8562
Sam@blackandbuffone.com

-and-

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3225 Shallowford Road
Suite 1120
Marietta, GA 30062
Telephone: (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

*Attorneys for Plaintiff-Relator Kari Crutcher*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA; *ex rel.* KARI CRUTCHER,<br><br>   Plaintiff,<br><br> v.<br><br>FIRST GUARANTY MORTGAGE CORPORATION,<br><br>PACIFIC INVESTMENT MANAGEMENT COMPANY LLC,<br><br>PIMCO INVESTMENTS LLC,<br><br>AARON SAMPLES,<br><br>ANDREW PETERS<br><br>JILL WINTERS,<br><br>and SUZY LINDBLOM.<br><br>   Defendants. | Civil Action No. 16-CV-03812-SCJ |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF RESPONSE IN OPPOSITION TO DEFENDANTS PACIFIC INVESTMENT MANAGEMENT COMPANY LLC'S AND PIMCO INVESTMENTS LLC'S MOTION TO DISMISS AND CROSS-MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

# **TABLE OF CONTENTS**

Table of Authorities ............................................................................... ii

Introduction ............................................................................................ 1

Facts and Procedural Background ........................................................... 2

Argument................................................................................................. 6

   I.   The Court Should Grant Leave to Amend to Add Details of PIMCO'S Involvement in The Fraud.......................................................... 8

   II.  The Claims Are Timely ............................................................... 10

   III. FRCP 19 Does not Provide a Basis to Dismiss the Complaint ......................... 12

      A.   FGMC is not an Indispensable Party Under Rule 19(a) .........................12

      B.   FGMC is a Party and the Bankruptcy Court Does not Object.................15

      C.   PIMCO Fails to Address Rule 19(b)..................................................16

   IV. The Complaint States A Claim Against FGMC AND PIMCO......................... 17

# TABLE OF AUTHORITIES

**Cases**

*555 M Mfg. v. Calvin Klein, Inc,* 13 F.Supp.2d 719 (N.D. Ill. 1998)......................16

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009)...........................................8

*Bailey v. Six Flags Entm't Corp.,* 2019 U.S. Dist. LEXIS 229606 (N.D. Ga. Dec. 15, 2019)................................................................................................................17

*Beach Cmty. Bank v. CBG Real Estate LLC*, 674 Fed. Appx. 932 (11th Cir. 2017) ............................................................................................................................12

*Bradley v. Dekalb County,* 2010 U.S. Dist. LEXIS 118467 (N.D. Ga. May 17, 2010)................................................................................................................10

*Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 193 S. Ct. 1507 (2019).................11

*Colo. Nat'l Bank v. Adventura Assoc., Ltd. P'ship,* 757 F. Supp. 1169 (D. Colo. 1991)................................................................................................................17

*Espey v. Wainwright,* 734 F.2d 748 (11th Cir. 1984)................................................9

*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263 (11th Cir. 2003)................................................................................................................12

*Foman v.* Davis, 371 U.S. 178, 83 S. Ct. 227 (1962) ...............................................9

*Hadjian v. Mercedes-Benz, USA*, 2022 U.S. Dist. LEXIS 155559 (N.D. Ga. Mar. 31, 2022)................................................................................................................7

*In re First Guaranty Mortg. Corp.*, Case No. 22-10584 (Bankr. D. Del. Oct. 31, 2022)................................................................................................................5, 6

*Laurie v. Ala. Crim. App.*, 256 F.3d 1266 (11th Cir. 2001)......................................9

*Mortgages, Inc. v. U.S. Sist. Ct. for Dist. Of Nev.*, 934 F.2d 209 (9th Cir. 1991)...15

*N.L.R.B. v. O'Neil*, 965 F.2d 1522 (9th Cir. 1992).................................................11

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175 (2015)......................................................................................................24

*Renasant Bank, Inc. v. Smithgall*, 2016 U.S. Dist. LEXIS 138709 (N.D. Ga. Jun. 10, 2016) ..................................................................................................6, 7

*Sino-US Inv. & Mgmt. Consultant v. Hyun Soon Ree*, No. CV-20-8597, 2021 WL 5020469 (C.D. Cal. Mar. 9, 2021)........................................................14

*U.S. ex rel. Dougherty v. Guild Mortg. Co.*, Case No. 16cv2909-JAH (BLM) (S.D. Cal. 2019), ..............................................................................................19

*U.S. ex. rel. Thrower v. Acad. Mortg. Corp.*, 2018 U.S. Dist. LEXIS 144648 (N.D. Cal. Aug. 24, 2018) ....................................................................................18

*U.S. v. Honeywell Int'l Inc.*, 47 F.4th 805 (D.C. Cir. 2022)...................................14

*U.S. v. McNinch*, 356 U.S. 595, 78 S. Ct. 950 (1958) .............................................11

*U.S. v. Quicken Loans*, 239 F. Supp. 3d 1014 (E.D. Mich. 2017)..........................19

*United States ex rel. Calderon v. Carrington Mortg. Servs., LLC*, No. 16cv0920 (S.D. Ind. 2019) (slip op., ECF No. 141) ............................................................19

*United States ex rel. Ebu-Isaac v. Insys Therapeutics,* No. 2:16-CV-07937-JLS-AJW, 2021 U.S. Dist. LEXIS 163880 (C.D. Cal. June 9, 2021) ............. 8, 10, 23

*United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104 (D.D.C. 2014)...................................................................................................18

*United States v. Americus Mortg. Corp.*, 2013 U.S. Dist. LEXIS 132150 (S.D. Tex. Sept. 9, 2013)...............................................................................................19

*United States v. Carrington Mortg. Servs., LLC*, No. 1:16-cv-00920-RLY-MJD, 2022 U.S. Dist. LEXIS 67177 (S.D. Ind. Mar. 9, 2022).....................................22

*United States v. Mortg. Inv'rs Corp.*, 987 F.3d 1340 (11th Cir. 2021)...................24

*United States v. Movtady*, 13 F. Supp. 3d 325 (S.D.N.Y. 2014) ............................19

*United States v. Neifert-White Co.*, 390 U.S. 228 (1968)..................................8, 18

*United States v. Reunion Mortg., Inc.*, No. 13cv2340, 2013 WL 5944252 (N.D. Cal. Nov. 5, 2013) ...........................................................................19

*United States v. Wells Fargo Bank*, N.A, 972 F. Supp. 2d 593 (S.D.N.Y. 2013). 11, 19

*Universal Health Servs. v. United States,* 579 U.S. 176, 136 S. Ct. 1989, 2003 (2016) ................................................................................ 23, 24

*Willoughby v. Youth Vills., Inc.*, 2014 U.S. Dist. LEXIS 190198 (N.D. Ga. Oct. 9, 2014) .........................................................................................9

**Statutes**

31 U.S.C. § 3279 (a)(1)(B) .................................................... 17, 23

31 U.S.C. § 3729 ......................................................................1, 10

31 U.S.C. § 3729 (a)(1)(A) .................................................... 17, 23

31 U.S.C. § 3731(b)(1)-(2) .............................................................11

**Other Authorities**

U.S. Dept. of Justice, PR: *The False Claims Act & Federal Housing Administration Lending* (2016) ...........................................................21

**Rules**

Fed. R. Civ. P. 12(b)(6).............................................................6, 12

Fed. R. Civ. P. 15(a)(2).................................................................9

Fed. R. Civ. P. 19 ................................................................ 12, 15

Fed. R. Civ. P. 19(a)............................................................ 12, 15

Fed. R. Civ. P. 19(a)(1)(A) ................................................... 13, 14

Fed. R. Civ. P. 19(a)(1)(B)(i)................................................ 13, 14

Fed. R. Civ. P. 19(a)(1)(B)(ii)......................................................13

Fed. R. Civ. P. 19(b) ..................................................................... 12, 16, 17

Fed. R. Civ. P. 9(b) ............................................................................7

# INTRODUCTION

This case is about fraud on the United States. First Guarantee Mortgage Corporation (FGMC), under Pacific Investment Management Company LLC's and PIMCO Investments LLC's (collectively "PIMCO") direction and control, knowingly underwrote government-insured mortgages that were riskier than the government allowed. Defendants profited from this scheme, selling the loans and earning interest. When those risky loans eventually defaulted, Defendants kept their profits, and it was the United States that suffered the loss. This case is to right that wrong and return to the United States the Defendants' ill-gotten gains, make the United States whole, and properly deter others who would consider defrauding the United States.

PIMCO instead seeks to avoid all responsibility for this fraud. PIMCO argues it can buy a company, encourage and expand on its fraud, place it into bankruptcy when it gets caught, and then use that bankruptcy to try to shield itself from liability. That is neither just nor the proper legal outcome. PIMCO also raises other legally insufficient defenses based on the statute of limitations and the underlying claims against FGMC that are based on a basic misunderstanding of the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, and Federal Housing Administration (FHA) loans.

Plaintiff-Relator also respectfully asks this Court for leave to file a Second Amended Complaint that more fully lays out allegations as to PIMCO's role in the fraud. As the Second Amended Complaint makes clear, PIMCO was an involved and knowledgeable manager of FGMC. As such, the proposed Second Amended Complaint clearly states a direct claim against PIMCO as well as a basis to pierce the corporate veil and hold that FGMC operated as PIMCO's alter ego. After granting the motion to amend, all of PIMCO's arguments will fail.

## FACTS AND PROCEDURAL BACKGROUND

Plaintiff-Relator witnessed Defendants' fraud first-hand. She was hired in the build up to PIMCO's purchase of FGMC. Proposed Second Amended Complaint (Compl.) at 33.[1] She witnessed firsthand the risky mortgages FGMC underwrote and the requirements it was willing to ignore. *Id.* Plaintiff-Relator raised concerns with Defendants' actions, but she was ignored and fired. Compl. at 194-200. The United States diligently investigated the Plaintiff-Relator's claims, analyzing subpoenaed documents, reviewing loan files, and engaging in settlement discussions with FGMC. But those discussions were abruptly cut short when

---

[1] As discussed below, Plaintiff-Relator is cross-moving to file a second amended complaint to add in details about PIMCO's involvement in the fraud. For clarity so as not to cite to two different complaints, all citations to the complaint are to the Proposed Second Amended Complaint, attached hereto. Attachment 1.

FGMC declared bankruptcy. Prior to FGMC declaring bankruptcy, Plaintiff-Relator added the PIMCO defendants. ECF No. 19. Recognizing the procedural hurdles Defendants put up to recovering from Defendants' fraud and trusting the Plaintiff-Relator to pursue the United States' claim, the United States declined to intervene and allowed the Plaintiff-Relator to pursue these claims, in this Court and the bankruptcy court in Delaware. ECF No. 28.

The Complaint generally alleges that FGMC was a mortgage origination company that, in part, originated and underwrote loans insured by the United States Department of Housing and Urban Development's (HUD) Federal Housing Administration (FHA). Compl. at 2. HUD granted FGMC the ability to endorse loans for FHA insurance without any prior review. Compl. at 4. This trust gave FGMC the ability to put HUD on the hook if FGMC made risky lending decisions. Compl. at 6. But HUD required FGMC to certify, for each mortgage, that it met HUD's rules meant to minimize the risk to HUD. Compl. at 4. FGMC ignored this promise and ignored HUD rules, gaining the benefit of these risky loans while putting the risk on the United States. Compl. at 6-8.

FGMC engaged in multiple fraudulent practices that all led to the ultimate goal of the fraud: endorsing ineligible loans for FHA insurance. Compl. at 6-8. Those practices included:

- instructing employees to "fix" loans by intentionally miscalculating or misrepresenting borrowers' income or debt obligations. Compl. at 126-27;

- manipulating the data input to HUD's underwriting algorithm in order to receive "Accept/Approve" ratings for otherwise ineligible loans. Compl. at 113-15;

- hiding adverse documentation that would negatively impact the eligibility of a loan to receive FHA insurance. Compl. at 129;

- establishing a management exception process that allowed underwriting staff to request management approval for an exception to underwriting requirements that a loan could not meet. Compl. at 106;

- directing underwriters to overlook or ignore HUD guidelines and rules when they raised issues or concerns with managers regarding potential noncompliance. Compl. at 107;

- directing underwriters to not record notes in their internal computer system that reflected their noncompliance with FHA guidelines. Compl. at 110;

- and, pressuring underwriters to approve ineligible loans through the use of a quota system for loan origination, forcing underwriters to prioritize

loan origination over regulatory compliance in order to keep their jobs. Compl. at 111.

PIMCO bought FGMC in the middle of FGMC's fraud. Compl. at 21. The fraud did not stop. PIMCO liked risky loans. Compl. at 21. And PIMCO exercised the control it had purchased. Compl. at 175. PIMCO forced FGMC to switch to PIMCO's preferred communications system so PIMCO could seamlessly direct FGMC's actions. Compl. at 178. PIMCO hand-picked FGMC's executives and directed other employment decisions. Compl. at 176. PIMCO developed and directed FGMC's risk policies, and PIMCO wanted riskier loans. Compl. at 185. PIMCO also received reports on FGMC's quality control, investor buybacks, and indemnifications. Compl. at 183-84. Through its actions, PIMCO caused FGMC to submit the false certifications and caused the false claims. Compl. at 190. PIMCO is both directly liable for the fraud and liable under the piercing of the corporate veil and the alter ego theories of liability. Compl. at 191-92.

FGMC filed for bankruptcy on June 30, 2022. On October 31, 2022, the bankruptcy court held a hearing on the approval of the Chapter 11 plan proposed by FGMC. *See* Transcript of Video Hearing at 14, *In re First Guaranty Mortg. Corp.*, Case No. 22-10584 (Bankr. D. Del. Oct. 31, 2022), ECF No. 667 (Attachment 2). PIMCO attended that hearing. *Id.* At the hearing, the Court stated that, in the event

another court did find FGMC to be an indispensable party in an action against a third party, the relator could "[request] to name them a nominal party." *Id.* After attending that hearing, PIMCO filed this Motion to Dismiss (Motion) on November 28, 2022. ECF 49. The Court extended Plaintiff-Relator's deadline to respond to the Motion until January 11, 2023. ECF 66. On December 13, 2022, Plaintiff-Relator moved for a lift of the stay in the Amended and Modified Chapter 11 Bankruptcy Plan of FGMG in *In re First Guaranty Mortg. Corp*, (ECF No. 712). Along with this opposition, Plaintiff-Relator filed a notice of voluntary dismissal with respect to the individual defendants.

Counsel reached out to counsel for PIMCO on January 10, 2023, provided a redline copy of the Proposed Amended Complaint, and asked PIMCO's position on consenting to the Proposed Amended Complaint. Declaration of Samuel Buffone at 3 (Buffone Decl.) (Attachment 3). PIMCO's refused to consent. *Id.* at 4.

## ARGUMENT

Courts "will not" dismiss a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), "unless it is plain that the plaintiff can prove no set of facts that would support the claims in the complaint." *See Renasant Bank, Inc. v. Smithgall*, 2016 U.S. Dist. LEXIS 138709 at *4 (N.D. Ga. Jun. 10, 2016) (J. Jones) (internal citations omitted). When evaluating a motion to dismiss, the court applies a "two-

step framework," first identifying and rejecting all conclusory allegations, then "determin[ing] whether [the remaining] factual allegations plausibly give rise to an entitlement to relief." *Hadjian v. Mercedes-Benz, USA*, 2022 U.S. Dist. LEXIS 155559 at *10 (N.D. Ga. Mar. 31, 2022) (J. Jones) (internal citations omitted). The court "must accept all well-pleaded factual allegations in the complaint to be true." *See Renasant Bank* at *4.* (internal citations omitted).

In claims "alleg[ing] fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," in order to "alert defendants to the precise misconduct with which they are charged. *See Hadjian* at *12 (N.D. Ga. Mar. 31, 2022) (internal citations omitted). Complaints are sufficiently pled when they set forth: "(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making [or not making] them; (3) the content of such statements and the manner in which they misled the plaintiff, and; (4) what the defendant obtained as a consequence of the fraud." *Id.* at *12 (internal citation omitted). But Rule 9(b)'s heightened requirements "[do not] abrogate the concept of notice pleading." *Id.*

Scienter does not need to be pled according to the heightened particularity standards in Rule 9(b). *See* Fed. R. Civ. P. 9(b) (stating "[m]alice, intent,

knowledge, and other conditions of a person's mind may be alleged generally"). Instead, the complaint only needs to allege facts which give rise to a reasonable inference of plausible basis that the defendant acted with the requisite scienter. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686-87 (noting that allegations of malice, intent, knowledge, and other conditions of a person's mind need only comply with Rule 8(a) standards).

The FCA is designed "to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). This includes the corporate owners, like PIMCO, that cause the false statements and false claims. *United States ex rel. Ebu-Isaac v. Insys Therapeutics,* No. 2:16-CV-07937-JLS-AJW, 2021 U.S. Dist. LEXIS 163880, at *17 (C.D. Cal. June 9, 2021) (holding the complaint properly stated a claim against a venture capital investor).

## I.  THE COURT SHOULD GRANT LEAVE TO AMEND TO ADD DETAILS OF PIMCO'S INVOLVEMENT IN THE FRAUD

PIMCO's primary argument is that the current complaint does not articulate PIMCO's role in the fraud. As the proposed amendment makes clear, PIMCO was deeply involved in FGMC's actions and had both the requisite knowledge and involvement to cause FGMC's false certifications to HUD as well as the eventual false claims. As such, PIMCO is directly liable for the submission of false claims.

Additionally, because of PIMCO's actions, PIMCO is also liable under both the alter ego and piercing the corporate veil theories of liability.

Under Fed. R. Civ. P. 15(a)(2), courts should "freely give leave when justice so requires." A denial of Plaintiff's request for leave to amend requires "substantial justification[.]" *See Willoughby v. Youth Vills., Inc.*, 2014 U.S. Dist. LEXIS 190198 at *5 (N.D. Ga. Oct. 9, 2014) (J. Jones) (citing *Laurie v. Ala. Crim. App.*, 256 F.3d 1266, 1274 (11th Cir. 2001)); *see also Espey v. Wainwright,* 734 F.2d 748, 750 (11th Cir. 1984) (stating "Rule 15(a) severely restricts the district court's freedom, directing that leave to amend shall be freely given when justice so requires"). Courts cannot "outright refus[e] to grant the leave" to amend unless there is an "apparent or declared reason" that the motion should be refused, "such as undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies […], undue prejudice to the opposing party […], [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Here Plaintiff-Relator seeks to expeditiously amend her complaint in good faith in response to PIMCO's Motion, based in part on newly learned information concerning PIMCO's involvement in the fraud. Further, because none of PIMCO's other arguments have merit, the proposed Amended Complaint will fully state a claim on which relief can be granted.

Specifically, the proposed Amended Complaint identifies the numerous ways that PIMCO exercised control over FGMC such that PIMCO caused FGMC's false statements and false claims. *See United States ex rel. Ebu-Isaac v. Insys Therapeutics,* No. 2:16-CV-07937-JLS-AJW, 2021 U.S. Dist. LEXIS 163880, at *17 (C.D. Cal. June 9, 2021). To the extent PIMCO disagrees, it can file a new motion to dismiss the amended complaint identifying any alleged deficiency. *See Bradley v. Dekalb County,* 2010 U.S. Dist. LEXIS 118467 (N.D. Ga. May 17, 2010) (granting a motion to amend, denying motion to dismiss as moot, and analyzing defendant's second motion to dismiss). Further, to the extent the proposed amended complaint has any deficiencies in pleading claims against PIMCO, Plaintiff-Relator respectfully requests the opportunity to cure those defects. Buffone Decl. at 6.

Granting leave to amend will allow the case to move forward expeditiously to a just resolution. Additionally, the Amended Complaint clarifies that Plaintiff-Relator does not allege the retaliation counts against PIMCO and drops the individual defendants for which Plaintiff-Relator filed a separate notice of dismissal.

## II.    THE CLAIMS ARE TIMELY

Under the FCA, an action may not be brought "[1] more than 6 years after the date on which the violation of [31 U.S.C. § 3729] is committed... or [2] more than 3 years after the date when facts material to the right of action are known or

reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed." 31 U.S.C. § 3731(b)(1)-(2). A relator in a declined FCA action may use either calculation of the statute of limitations. *Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 193 S. Ct. 1507, 1512 (2019).

Fraudulently obtaining FHA insurance is not a "claim" for purposes of the FCA; instead, a claim is only made upon submission of a demand for disbursement of funds. *See U.S. v. McNinch*, 356 U.S. 595, 599 (1958); *see also United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 609 n.8 (S.D.N.Y. 2013) (noting that the statute of limitations runs not from the misconduct but from the submission and payment of the claim). Accordingly, the statute of limitations only begins to run upon the submission of the claim for insurance rather than at the underwriting of the loan. Even under the FCA's six-year statute of limitations, many of the claims identified in the Complaint are timely. Compl. at 168(a), (f). Additionally, the Complaint alleges practices that continued under PIMCO and past June 2016. Finally, the Proposed Amended Complaint alleges an alter ego theory of liability under which the claims will relate back to the original complaint. *See N.L.R.B. v. O'Neil*, 965 F.2d 1522, 1529 (9th Cir. 1992). The Court should therefore deny

PIMCO's Motion and address any statute of limitations defense at summary judgment. *See, e.g., Beach Cmty. Bank v. CBG Real Estate LLC*, <u>674 Fed. Appx. 932, 934</u> (11th Cir. 2017) (finding that "at the Rule 12(b)(6) stage the district court may dismiss a claim on statute of limitations grounds only if it is apparent from the face of the complaint that the claim is time-barred").

## III. RULE 19 DOES NOT PROVIDE A BASIS TO DISMISS THE COMPLAINT

PIMCO argues that because FGMC is in bankruptcy, no one can be held responsible for FGMC's fraud. This aggressive argument is simply incorrect. First, under Rule 19(a), FGMC is not an indispensable party. Second, FGMC is in fact a party, and the bankruptcy court has indicated it will lift the stay to allow the action to proceed against FGMC as a nominal defendant. Third, PIMCO ignores the requirements of Rule 19(b), which favors allowing this action to proceed without FGMC.

### A. FGMC is not an Indispensable Party Under Rule 19(a)

PIMCO correctly points out that "[f]irst, the court must ascertain under the standards of Rule 19(a) whether the person in question is one who should be joined if feasible." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, <u>344 F.3d 1263, 1280</u> (11th Cir. 2003). Under Rule 19, a party must be joined if (1) "in that person's absence, the court cannot accord complete relief among existing parties;"

(a)(1)(A); (2) the person's absence may "impair or impede the person's ability to protect the interest; or" (a)(1)(B)(i); (3) the person's absence may "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." (a)(1)(B)(ii). However, PIMCO fails to articulate why FGMC is an indispensable party. This action seeks monetary relief, and as such, PIMCO can provide full relief. This action will not impair or impede FGMC's rights in any way. And the FCA provides joint and several liability and so a judgment against PIMCO will not lead to double, multiple, or otherwise inconsistent obligations. As such, FGMC is not an indispensable party, and the Court need not perform any additional analysis.

PIMCO makes some seemingly irrelevant, unsupported, and incorrect statements that the Court should ignore. First, PIMCO states that Plaintiff-Relator must "seek a judgment against FGMC on the basis that it violated the FCA, which Relator must first establish before any other Defendant can be held liable for such violation." Mot. at 12. This seems to imply that Plaintiff-Relator must pursue the action against FGMC first, a statement that is neither supported nor correct. PIMCO also states that FGMC is an indispensable party "because liability of any other Defendant depends on first establishing FGMC's liability." Mot. at 14. Again, this statement is not supported and does not relate to any factor under Rule

19(a). PIMCO states that "because a finding against PIMCO would necessarily imply a finding against FGMC, FGMC is an indispensable party." Mot. at 16. This argument appears based on Rule 19(a)(1)(B)(i) and *Sino-US Inv. & Mgmt. Consultant v. Hyun Soon Ree*, No. CV-20-8597, 2021 WL 5020469, at *11 (C.D. Cal. Mar. 9, 2021). However, as PIMCO notes, *Sino-US Inv. & Mgmt. Consultant* is based on California agency law, which is not at issue here. And, as discussed below, the bankruptcy court, which is tasked with protecting FGMC from judgments, does not believe that a judgment against PIMCO would impair or impede FGMC's interests. Therefore, FGMC is not an indispensable party under Rule 19(a)(1)(B)(i). Finally, PIMCO states that "the Amended Complaint makes clear that any false claims were submitted only by FGMC. Accordingly, FGMC's presence in this action is necessary to afford complete and fair relief." Mot. at 17. While this appears to argue that FGMC is an indispensable party under Rule 19(a)(1)(A), PIMCO fails to explain why PIMCO cannot provide complete relief. This case is only seeking monetary relief, and PIMCO provides no reason why PIMCO cannot provide that relief.

The current situation is no different from when one party settles and plaintiff seeks full relief from the non-settling parties. *U.S. v. Honeywell Int'l Inc.*, 47 F.4th 805, 814, 819 (D.C. Cir. 2022) (finding that "a person who violates the FCA in a

joint scheme may have to pay for all the government's trebled damages, and, even if that defendant is the least responsible party, it cannot force the other violators to pay their fair share" and that "precedent establishes that liability under the FCA is joint and several with no right to contribution among joint violators"); *see also Mortgages, Inc. v. U.S. Sist. Ct. for Dist. Of Nev.*, 934 F.2d 209, 212 (9th Cir. 1991) (*per curiam*) (finding the FCA does not provide a right to contribution or indemnification and stating "[w]here one or more persons have committed a fraud upon the government in violation of the FCA, each is joint and severally liable for the treble damages and statutory penalty"). FGMC's bankruptcy may force PIMCO to bear a larger or the entirety of the cost of the fraudulent scheme. PIMCO cannot hide behind Rule 19 to avoid this result. PIMCO has simply failed to articulate any reason why FGMC is an indispensable party under Rule 19(a).

### B.    FGMC is a Party and the Bankruptcy Court Does not Object

Even if FGMC is an indispensable party, it is in fact a party. PIMCO attended the October 31, 2022, hearing in the bankruptcy proceeding. Attachment 2. There, the bankruptcy court specifically addressed this issue stating that the Plaintiff-Relator "opted out of the third-party releases, which means nothing in the bankruptcy case -- before confirmation, the automatic stay isn't stopping you from chasing third parties. Post- confirmation, there isn't going to be any release that

stops you from cashing third parties. To the extent a court somewhere else says, no, you can't chase this third-party because the debtor is an indispensable party, you can then come back and say I need to name them a nominal party." *Id.* at 76, 1-9. The bankruptcy court has made its position clear: the bankruptcy proceeding does not stand in the way of pursuing PIMCO. *See 555 M Mfg. v. Calvin Klein, Inc,* 13 F.Supp.2d 719-22 (N.D. Ill. 1998) (refusing to stay a litigation because of bankruptcy and stating that "[t]he silence of those entities [the bankruptcy court and defendant] on this issue is pregnant"). Either, as explained above, FGMC is not an indispensable party, or, should this Court require it, the bankruptcy court will lift the stay and allow FGMC to continue as a nominal party.

### C.   PIMCO Fails to Address Rule 19(b)

Finally, PIMCO ignores Rule 19(b), which states that "if a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the

person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."

The Court should consider PIMCO's argument waived as PIMCO failed to address Rule 19(b). *See Bailey v. Six Flags Entm't Corp.,* 2019 U.S. Dist. LEXIS 229606 at *5-6 (N.D. Ga. Dec. 15, 2019). Further, every factor favors allowing the action to proceed against PIMCO. *See Colo. Nat'l Bank v. Adventura Assoc., Ltd. P'ship,* 757 F. Supp. 1169-70 (D. Colo. 1991). There is no prejudice from the action proceeding; to the extent PIMCO identifies any prejudice, the Court can fashion the remedy to address it; the judgement against PIMCO will be adequate; and PIMCO's proposed course of action unfairly leaves the Plaintiff-Relator and the United States without a remedy.

## IV.   THE COMPLAINT STATES A CLAIM AGAINST FGMC AND PIMCO

PIMCO's primary argument that is not addressed through the proposed Amended Complaint is that the Complaint does not state a claim against FGMC. This argument is based on a basic misunderstanding of the FCA and the FHA program.

The Complaint alleges two types of FCA claims—"Presentment Claims" under Section 3729(a)(1)(A) and "Statement Claims" under Section 3729(a)(1)(B). These claims are designed "to reach all types of fraud, without qualification, that

-17-

might result in financial loss to the Government." *United States v. Neifert-White Co.*, <u>390 U.S. 228, 232</u> (1968). Both include a 'causes to be presented' prong. In "examining whether a non-submitting party has "caused" the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission." *United States ex rel. Tran v. Computer Scis. Corp.*, <u>53 F. Supp. 3d 104, 127</u> (D.D.C. 2014) (alterations omitted; collecting cases). "Put differently, "the False Claims Act extends beyond the person making a false claim to one who engages in a fraudulent course of conduct that induces payment by the government."" *Computer Scis.*, <u>53 F. Supp. 3d at 126</u> (alterations omitted; collecting cases).

Courts have regularly held that lenders can be liable for fraudulently endorsing loans for FHA insurance. *U.S. ex. rel. Thrower v. Acad. Mortg. Corp.*, <u>2018 U.S. Dist. LEXIS 144648, at *22-3</u> (N.D. Cal. Aug. 24, 2018), (holding complaint properly alleged "subsequent claims are false because of an original fraud," which may include "a certification or otherwise," and that "the original fraud can be found in either the annual certification or a loan-level certification...[and] [b]ecause Academy's participation in the DE program for a particular year is premised on the annual certification, every loan endorsement under the DE program would be a fraudulently obtained contract or extension of …

government benefit.") (internal citations omitted); *U.S. v. Quicken Loans*, 239 F. Supp. 3d 1014, 1039 (E.D. Mich. 2017), (finding "the allegations in the complaint support an inference that FHA would not have insured the particular loans at issue in this case had it known of Quicken's alleged noncompliance with underwriting requirements."); *Wells Fargo Bank, N.A.*, 972 F. Supp. 2d at 622-25 (S.D.N.Y. 2013) (recognizing claims under the FCA according to the theories of false certifications and fraudulent inducement and that the conduct "fraudulently induced HUD to insure loans that were ineligible for such insurance. It did so, the Government alleges, by certifying that the mortgages met certain requirements for FHA insurance that they did not, in fact, meet"), *United States v. Americus Mortg. Corp.*, 2013 U.S. Dist. LEXIS 132150, at *25 (S.D. Tex. Sept. 9, 2013), *U.S. ex rel. Dougherty v. Guild Mortg. Co.*, Case No. 16cv2909-JAH (BLM) (S.D. Cal. 2019), Attachment 4, *United States ex rel. Calderon v. Carrington Mortg. Servs., LLC*, No. 16cv0920 (S.D. Ind. Jan. 22, 2019) (slip op., ECF No. 141), Attachment 5, *United States v. Movtady*, 13 F. Supp. 3d 325 (S.D.N.Y. 2014), *United States v. Reunion Mortg., Inc.*, No. 13cv2340, 2013 WL 5944252 (N.D. Cal. Nov. 5, 2013).

Notably, each of these cases settled for millions to billions of dollars or led to a judgment after trial: Wells Fargo settled for $1.2 billion,[2] Americus Mortgage had a judgment entered for $296 million after trial,[3] Academy Mortgage settled for $38.5 million after the government declined to intervene,[4] Movtady resulted in a $36 million judgement against the lender,[5] Quicken settled for $32.5 million,[6] Guild Mortgage settled for $24.9 million,[7] and Reunion Mortgage settled for $1.04

---

[2] Press Release, Dep't of Justice, Wells Fargo Bank Agrees to Pay $1.2 Billion for Improper Mortgage Lending Practices (Apr. 8, 2016), https://www.justice.gov/opa/pr/wells-fargo-bank-agrees-pay-12-billion-improper-mortgage-lending-practices

[3] Press Release, Dep't of Justice, Acting Manhattan U.S. Attorney Announces Award Of $296 Million Judgment Against Allied Home Mortgage Entities For Civil Mortgage Fraud (Sept. 19, 2017), https://www.justice.gov/usao-sdny/pr/acting-manhattan-us-attorney-announces-award-296-million-judgment-against-allied-home

[4] Press Release, Dep't of Justice, Academy Mortgage Corporation Agrees to Pay $38.5 Million to Settle False Claims Act Allegations Related to Mortgages Insured by the Federal Housing Administration (Dec. 14, 2022), https://www.justice.gov/opa/pr/academy-mortgage-corporation-agrees-pay-385-million-settle-false-claims-act-allegations

[5] Press Release, Dep't of Justice, Manhattan U.S. Attorney Settles Civil Mortgage Fraud Lawsuit Against Golden First Mortgage Corp. And Its Owner, David Movtady (Dec. 31, 2014), https://www.justice.gov/archive/usao/nys/pressreleases/December14/GoldenFirstSettlementPR.php

[6] Claire Duffy, *Quicken Loans settles with Federal Housing Authority in fraudulent lending case*, CNN (Jun. 14, 2019), https://www.cnn.com/2019/06/14/homes/quicken-loans-fha-lending-settlement/index.html

[7] Claire Duffy, *Quicken Loans settles with Federal Housing Authority in fraudulent lending case*, CNN (Jun. 14, 2019), https://www.cnn.com/2019/06/14/homes/quicken-loans-fha-lending-settlement/index.html

million.[8] This is in addition to the billions of dollars in other settlements the Department of Justice obtained without filing suit and surviving a motion to dismiss.[9]

In fact, FHA FCA enforcement is so standard that the Department of Justice issued a memorandum in 2016 titled "The False Claims Act & Federal Housing Administration Lending," explaining how material underwriting defects, including "failing to verify a borrower's employment, assets, or credit in accordance with FHA's requirements; materially overstating a borrower's income, assets, or willingness to repay the mortgage loan; materially understating a borrower's liabilities or ability to repay the mortgage loans; and failing to ensure the property provides adequate collateral for the mortgage loan" can lead to liability under the FCA.[10] As PIMCO recognizes "[l]ogic counsels that if a specific regulatory

---

[8] Press Release, U.S. Attorney's Office for N.D. Cal., Reunion Mortgage, Inc. To Pay $1.04 Million To Resolve Allegations Of Defrauding The Federal Housing Administration Programhttps://www.justice.gov/usao-ndca/pr/reunion-mortgage-inc-pay-104-million-resolve-allegations-defrauding-federal-housing

[9] *See e.g.* Dep't of Justice, Deputy Associate Attorney General Stephen Cox Provides Keynote Remarks at the 2020 Advanced Forum on False Claims and Qui Tam Enforcement, https://www.justice.gov/opa/speech/deputy-associate-attorney-general-stephen-cox-provides-keynote-remarks-2020-advanced citing "settlements with over 20 lenders for more than $4.75 billion."

[10] Dep't of Justice, The False Claims Act & Federal Housing Administration Lending, https://www.justice.gov/archives/opa/blog/false-claims-act-federal-housing-administration-lending

requirement is critical, the government will act in response to a violation," mot. at 23, and the United States has, repeatedly, and for billions of dollars, acted on violations of the exact false certifications alleged here.

PIMCO ignores this well-settled caselaw on FCA liability for FHA insurance fraud, only citing the summary judgement opinion in *Carrington Mortg. Servs., LLC*, No. 1:16-cv-00920-RLY-MJD, 2022 U.S. Dist. LEXIS 67177, at *11 (S.D. Ind. Mar. 9, 2022). Instead, PIMCO tries to analogize to FCA cases in the healthcare context to ask this Court to depart from well-settled law and hold that fraudulently certifying a loan meets FHA's underwriting requirements when it does not is insufficient to state an FCA claim. The Court should decline to take this drastic and novel reading of the FCA pleading requirements for FHA insurance fraud.

Specifically, PIMCO states that the Complaint fails to allege false claims and false statements. This is simply incorrect. The complaint alleges numerous false statements and false claims. *See e.g.* compl. at 100 (alleging knowing and false certification); 119 (alleging false statements in manipulation of AUS); 123 (alleging false annual and loan level certifications); 168-69 (identifying specific false claims). These false statements and false claims are the same type found sufficient by every other court to address similar allegations.

PIMCO similarly makes factually or legally incorrect arguments to try to avoid this Court reaching the same conclusion as every other court that has addressed similar allegations. First, PIMCO states that "Relator must plead with particularity how a false statement by each Defendant reached the government and caused it to pay amounts it did not owe." This reads out causes from both 31 U.S.C. § 3729 (a)(1)(A) and (a)(1)(B). As the amended complaint alleges, PIMCO caused FGMC's false statements and false claims, a legally sufficient allegation for PIMCO's liability. *See United States ex rel. Ebu-Isaac v. Insys Therapeutics,* No. 2:16-CV-07937-JLS-AJW, 2021 U.S. Dist. LEXIS 163880, at *17 (C.D. Cal. June 9, 2021) (holding a venture capital fund investor sufficiently alleged to have caused false claims to be submitted by a subsidiary investment).

PIMCO also miscites *Universal Health Servs. v. United States,* 579 U.S. 176, 194-95, 136 S. Ct. 1989, 2003 (2016) incorrectly stating "Relator must plead that any Defendant knew that the government would actually decline payment." The Supreme Court actually said, "proof of materiality **can include, but is not necessarily limited to,** evidence that the defendant knows that the Government consistently refuses to pay claims[.]" *Id.* (emphasis added). Instead, the Supreme Court made clear that FCA materiality is no different than materiality in other contexts that "look[s] to the effect on the likely or actual behavior of the recipient

of the alleged misrepresentation." *Id.* at 193 (internal quotation omitted). And, with the well-publicized enforcement cited above, it is unclear how Defendants could not know the United States would enforce the false certifications alleged here. Finally, PIMCO attacks the certifications that numerous other courts have upheld as the basis for a false claim, citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-85 (2015). But the certification in *Omnicare* was based on belief, whereas here the certification is specific; in part, that the loan is "eligible for HUD mortgage insurance under the Direct Endorsement program." Compl. at 86. *See also United States v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1345 (11th Cir. 2021) (analyzing materiality of a certification of compliance with VA regulations for VA insured mortgages).

## CONCLUSION

For all the foregoing reasons, Defendants Pacific Investment Management Company LCC and PIMCO Investments LLC's Motion to Dismiss should be denied, and Plaintiff-Relator Crutcher should be granted leave to file her Second Amended Complaint.

Respectfully submitted this 11th day of January, 2023.

/ s/ Jonathan W. Ferris

J. Nelson Thomas, Esq. (admitted *pro hac vice*)
Jonathan W. Ferris, Esq. (admitted *pro hac vice*)
**THOMAS & SOLOMON LLP**
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@ theemploymentattorneys.com
jferris@theemploymentattorneys.com

-and-

Samuel J. Buffone, Jr. (*Pro hace vice* application forthcoming)
Michael DeJesus
**Black & Buffone PLLC**
1400 Eye St. NW
Suite 200
Washington, D.C. 20005
Telephone: (202) 997-8562
Sam@blackandbuffone.com

-and-

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3225 Shallowford Road
Suite 1120
Marietta, GA 30062

-25-

Telephone: (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

***Attorneys for Plaintiff-Relator Kari
Crutcher***

**CERTIFICATION**

Counsel for Plaintiff-Relator Kari Crutcher certifies, per N.D. Ga. L. Civ. R. 7.1D, that the foregoing document was prepared with one of the font and point selections (Times New Roman, 14 point) approved by N.D. Ga. L. Civ. R. 5.1B.

/ s/ Jonathan W. Ferris

J. Nelson Thomas, Esq. (admitted *pro hac vice*)
Jonathan W. Ferris, Esq. (admitted *pro hac vice*)
**THOMAS & SOLOMON LLP**
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@ theemploymentattorneys.com
jferris@theemploymentattorneys.com

***Attorneys for Plaintiff-Relator Kari Crutcher***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the indicated date, the undersigned filed and served the foregoing document, using the Court's CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

Dated: January 11, 2023

By: <u>/ s/ Jonathan W. Ferris</u>

J. Nelson Thomas, Esq. (admitted *pro hac vice*)
Jonathan W. Ferris, Esq. (admitted *pro hac vice*)
**THOMAS & SOLOMON LLP**
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@ theemploymentattorneys.com
jferris@theemploymentattorneys.com

***Attorneys for Plaintiff-Relator Kari Crutcher***



**Response in Opposition to Defendants Motion to Dismiss and Cross-Motion for Leave to File Second Amended Complaint**

### Index of Exhibits

Attachment 1:       Second Amended Complaint

Attachment 2:       Transcript of Video Hearing, *In re First Guaranty Mortg. Corp.,* Case No. 22-10584 (Bankr. D. Del. Oct 31, 2022), <u>Dkt. No. 667</u>

<u>At</u>tachment 3:       Declaration of Sam Buffone

Attachment 4:       Order Denying Defendant's Motion to Dismiss, *U.S. ex rel. Dougherty v. Guild Mortg. Co.,* Case No. 16cv2909-JAH (BLM) (S.D. Cal. Sept. 11, 2019)

Attachment 5:       Entry on Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint, *United States ex rel. Calderon v. Carrington Mortg. Servs., LLC,* No. 16cv0920 (S.D. Ind. Jan. 22, 2019) (slip op., <u>ECF No. 141</u>)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KARI CRUTCHER,<br><br>                                    *Plaintiff*,<br><br>*v.*<br><br>FIRST GUARANTY MORTGAGE CORPORATION, PACIFIC INVESTMENT MANAGEMENT COMPANY, LLC, and PIMCO INVESTMENTS, LLC,<br><br><br>                          *Defendants.* | SECOND AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL<br><br>Civil Action No. 16-CV-03812-SCJ |

Relator Kari Crutcher brings this qui tam action in the name of the United States of America, by and through her undersigned attorneys Thomas & Solomon LLP, and alleges as follows:

## INTRODUCTION

1.      This is a civil fraud action by qui tam Kari Crutcher on behalf of the United States ("the Government"), against First Guaranty Mortgage Corporation, Pacific Investment Management Company, LLC, and PIMCO Investments, LLC, (collectively "FGMC" or "Defendants") to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, for damages

sustained by the United States Department of Housing and Urban Development ("HUD") in connection with FGMC's origination of residential mortgage loans underwritten and approved by FGMC and endorsed for Federal Housing Administration ("FHA") insurance.

2.    FGMC, a lender approved by HUD to originate and underwrite single-family residential mortgages insured by HUD, knowingly approved loans that violated FHA rules while falsely certifying compliance with those rules. FGMC's conduct allowed it to profit from these loans, even if the borrowers defaulted on their mortgages.  As the risk was entirely on FHA, when the non-complaint loans inevitably defaulted, this materialized into millions of dollars in losses to HUD.

3.    The FHA program promotes American homeownership through its "Direct Endorsement Lender" program.  Under this program, the FHA insures loans so long as they satisfy certain requirements.   For these loans, the FHA guarantees that mortgage holders will suffer no loss if the borrower ultimately does not repay the loan.  This program encourages lenders to extend loans to creditworthy low- and moderate-income families as well as first-time homebuyers.

4.    Under this program, lenders known as Direct Endorsement Lenders

are given the responsibility to determine whether the loans satisfy the requirements for FHA insurance.  Because Direct Endorsement Lenders are permitted to endorse loans for FHA insurance without prior HUD review, HUD requires these lenders to conduct due diligence on loans before endorsing them for FHA insurance, and relies on the truthfulness of their loan-specific certifications in extending that insurance.  As a result, the lender is expected and obligated to act with good faith, honesty, and fairness in its dealings with HUD.

5.     FGMC annually certified to HUD that it was following all of HUD's guidelines, rules, and regulations, when in fact it knew it did not, and had no intention of providing such services.

6.     FGMC's false statements in both individual loans as well as in its initial and annual certifications fraudulently induced (also known as promissory fraud) HUD to extend insurance coverage on home loans, as well as pay for losses on covered loans.

7.     FGMC made these false certifications repeatedly in regards to its underwriting and quality control processes and each false certification independently triggers FGMC's liability.

8.     FGMC failed to live up to its obligations under the FHA Direct Endorsement program.   FGMC's management instituted and encouraged

practices that led underwriters to break HUD rules and to approve ineligible loans.

9.      These policies and practices included FGMC allowing exceptions to HUD's underwriting requirements, manipulating key data, waiving conditions and documentation requirements, pressuring underwriters to approve loans ineligible for FHA insurance, and encouraging underwriters to disregard risks that were evident in the loan files.

10.     FGMC established a culture that valued getting a loan approved and endorsed for FHA insurance over complying with HUD's rules.  FGMC's aim was to get loans insured by the United States and sold for a profit—even when FGMC could not truthfully certify to FHA that the loan qualified for FHA insurance.

11.     FGMC encouraged its underwriting staff to approve loans, no matter what the borrower's circumstances or documentation.  FGMC employees often joked that borrowers came to FGMC last because they had been declined everywhere else, but would be approved by FGMC because "we approve everything."

12.     In order to "fix" these initially ineligible loans, FGMC taught and counseled employees on several mechanisms designed to falsely make loans eligible for FHA insurance.  This included tactics such as intentionally miscalculating or misrepresenting borrowers' income or debt obligations, ignoring

clear warning signs of fraud, and hiding adverse documentation.

13.     As one of its most common fraudulent practices, FGMC abused the FHA's TOTAL Mortgage Scoreboard, a credit-rating algorithm maintained by the FHA that worked in conjunction with FGMC's internal automated underwriting system ("AUS").  TOTAL rates loans as either "accept/approve" or "refer" based on data points that FGMC enters into the AUS, including the borrowers' income, debt, and assets information.  Loans that receive an "accept/approve" rating are subject to significantly fewer documentation requirements and less scrutiny than loans that receive a "refer" rating.  To get around HUD rules, FGMC would initially run a loan through its AUS and if it did not receive an "accept/approve" rating, FGMC would then run the loan repeatedly through AUS/TOTAL in order to find income, debt, and asset information that would allow the loan to gain an "accept/approve" rating.  Using the numbers obtained through this process, FGMC would have its underwriters work backwards from the known "accept/approve" data and would manipulate the borrowers' income, debts, and asset information in order to match up with the pre-determined acceptance numbers.

14.     Although this "working backwards" technique is a serious violation of HUD's underwriting rules, FGMC would frequently run borrower scenarios in

AUS/TOTAL multiple times in order to generate income and debt information that could then be manipulated.

15.     Employees that did not follow FGMC's methods to skirt the FHA rules and regulations were disciplined and/or terminated.  For example, if an underwriter did not subsequently follow the instructions of management to ignore or "waive" an underwriting condition, that employee could be subject to discipline including termination.

16.     FGMC also prioritized the mass approval of FHA loans by developing several strategies designed to generate as many approvals as possible.  For instance, although HUD requires an FHA lender to maintain a proper quality control system, FGMC failed to implement such a system and instead was only concerned with churning out loans.  Therefore, not only were there substantial errors in FGMC's underwriting process to begin with, but FGMC made no effort to use the required quality control process to identify and correct such deficiencies.

17.     Despite repeatedly underwriting loans that were ineligible for FHA insurance as they did not comply with HUD's rules and regulations, FGMC further violated HUD's self-reporting requirements by failing to report loans that it knew were affected by fraud and other serious violations.  This self-reporting requirement is meant to enable HUD to identify issues with FHA loans, and to

request reimbursement from lenders as appropriate.  Instead of making such self-disclosures, FGMC aimed to keep its deficient loans secretive.

18.    FGMC's conduct has caused improperly underwritten loans to be endorsed for FHA insurance where the loans did not satisfy HUD's requirements and where the borrowers ultimately did not repay the loans.

19.    Ineligible loans endorsed by FGMC have resulted in millions of dollars in existing losses to HUD and many additional loans are currently in default and will likely result in significant additional losses to the agency.

20.    HUD's underwriting requirements are designed not only to protect it and the taxpayers from improperly underwritten and unduly risky loans, but also to ensure that creditworthy borrowers are able to handle the monthly payments and to become lasting homeowners. FGMC's underwriting of ineligible loans and false certifications of compliance with applicable requirements undermined these objectives, harming homeowners and the housing market.

21.    In 2015, PIMCO bought FGMC with the stated goal of originating higher risk loans and more loans with the goal of increasing FGMC's profits. PIMCO did just that. However, on information and belief, PIMCO accomplished these goals by enabling and encouraging all of FGMC's worst practices.

## JURISDICTION AND VENUE

22.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

23.     This Court has personal jurisdiction over FGMC because FGMC transacts business within the Northern District of Georgia.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C.§ 1395, and 31 U.S.C. § 3732(a), because FGMC transacts business within this district.

25.     This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or otherwise as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4), but rather upon information provided by Relator Crutcher.

26.     In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source of these allegations, as defined by the FCA.  Relator has direct and independent knowledge of FGMC's fraudulent activities.   Relator   has   also   voluntarily   provided   this   information   to   the

Government prior to filing this action as required under 31 U.S.C. § 3730(e)(4)(B).

27.     Relator shall serve on the United States a copy of the original Complaint and a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

## THE PARTIES

28.     Defendant FGMC is a Virginia corporation.

29.     FGMC has a principal place of business located at 1900 Gallows Road, Suite 800, Tysons Corner, Virginia 22182.

30.     FGMC identifies its home office city to HUD as Tysons Corner, Virginia and is registered with HUD under Lender ID 75168.

31.     Defendant Pacific Investment Management Company, LLC ("PIMCO") is a limited liability company organized under the laws of Delaware with its principal place of business in Newport Beach, California.

32.     Defendant PIMCO Investments LLC is a Delaware corporation that is headquartered in New York, New York. PIMCO Investments LLC is a wholly-owned subsidiary of PIMCO and an indirect subsidiary of Allianz SE.

33.     Relator is a resident of Fenton, Missouri and worked remotely for FGMC as a Wholesale Underwriter from approximately September 2014 to

November 2014.

34.     Through her past work experiences and education, Relator has extensive knowledge of the rules and regulations applicable to FHA loans.

## FACTUAL BACKGROUND

*Civil Statutes to Combat Mortgage Fraud*

35.     The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

36.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(l)(B) (2010). The prior version of the false statements provision made liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. §3729(a)(2) (2006).

37.     The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the

information." <u>31 U.S.C. § 3729(b)</u> (2006); <u>31 U.S.C. § 3729(b)(I)(A)</u> (2010). The False

Claims Act provides that no proof of specific intent to defraud is required. <u>31</u>

<u>U.S.C. § 3729(b)</u> (2006); <u>31 U.S.C. § 3729(b)(I)(B)</u> (2010).

38.    Before May 2009, the False Claims Act defined the term "claim" to

include "any request or demand, whether under a contract or otherwise, for money

or property which is made to a contractor, grantee, or other recipient if the United

States Government provides any portion of the money or property which is

requested or demanded, or if the Government will reimburse such contractor,

grantee, or other recipient for any portion of the money or property which is

requested or demanded." <u>31 U.S.C. § 3729(c)(2006)</u>.

39.    Effective May 20, 2009, the False Claims Act now defines the term

"claim" to mean, in relevant part: "any request or demand, whether under a

contract or otherwise, for money or property and whether or not the United States

has title to the money or property, that: (i) is presented to an officer, employee, or

agent of the United States; or (ii) is made to a contractor, grantee, or other recipient,

if the money or property is to be spent or used on the Government's behalf or to

advance a Government program or interest, and if the United States Government

(I) provides or has provided any portion of the money or property requested or

demanded; or (II) will reimburse such contractor, grantee, or other recipient for

any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

40.    The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act.  *See United States v. Neifert-White Co.*, 390 U.S. 228,  232 (1968).

41.    Any person who violates the False Claims Act is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(G).

**HUD's FHA Mortgage Insurance Program**

42.    HUD is a cabinet-level agency of the United States. Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all. HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and

sustainable communities free from discrimination.

43.    FHA is a part of HUD and is one of the largest mortgage insurers in the world. Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception. Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family homebuyers originated and held by approved lenders, or mortgagees.

44.    If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD. HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default. The mortgage holder therefore suffers no loss when a borrower is unable to repay an FHA-insured mortgage. This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase. FHA mortgage insurance programs therefore help many creditworthy low- and moderate-income families as well as first-time homebuyers become homeowners.

45.    A lender must apply to be a Direct Endorsement Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf.

This is an important responsibility because HUD "does not review applications for mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a). Instead, the Direct Endorsement Lender underwrites mortgage loans on HUD's behalf and determines whether a borrower presents an acceptable credit risk for HUD. In underwriting the mortgage loan, the lender must determine whether the borrower and the mortgage loan meet HUD's requirements for FHA insurance and whether the "proposed mortgage is eligible for insurance under the applicable program regulations." *Id.* The Direct Endorsement Lender must decide whether or not to approve the borrower for an FHA-insured mortgage loan.

46.    After the Direct Endorsement Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan. The Direct Endorsement Lender must certify that the loan meets all of HUD's requirements and HUD relies on this certification to endorse the loan for FHA insurance.

47.    Certain Direct Endorsement Lenders apply to, and participate in, the Lender Insurance program in which the mortgagees themselves endorse the mortgage for FHA insurance and retain all documentation supporting the

mortgage. 24 C.F.R. § 203.6. The lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to HUD only at the Agency's request.

48.     A Direct Endorsement Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with HUD. "Under the . . . civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business relationship' has an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor." As a result, in addition to the regulatory duties addressed below, the Direct Endorsement Lender owes both a fiduciary duty and a duty of reasonable care to HUD.

**HUD's Direct Endorsement Program**

49.     The success of the Direct Endorsement Program depends upon proper underwriting of loan files. Participating lenders have to determine the eligibility of borrowers and loans for FHA insurance, and ensure the integrity of the data relied upon to make such determinations.

50.     Under the Direct Endorsement Program, HUD relies on the expertise and knowledge of the lenders.

51.     HUD also relies on the truthfulness of the certification the lender

completes on each loan certifying that the loan is eligible for FHA insurance. As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

52.    To obtain and maintain its status as a Direct Endorsement Lender, a lender must have qualified underwriters on staff.

53.    To qualify as a Direct Endorsement underwriter or "DE underwriter," an underwriter must satisfy several requirements.  The DE underwriter "must have a minimum of three years full-time recent experience (or equivalent experience) reviewing both credit applications and property appraisals."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.3; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.  The underwriter must also be a "reliable and responsible professional skilled in mortgage evaluation" and "must be able to demonstrate his or her knowledge and experience regarding the principles of mortgage underwriting." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.l; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.

54.     A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. That responsibility includes performing due diligence and ensuring accuracy.

*The FHA's Due Diligence Requirements*

55.     Proper due diligence is a critical component of the Direct Endorsement Program. It is required by federal regulation and HUD Handbooks. It is also required by virtue of the fiduciary duty and duty of reasonable care that the Direct Endorsement Lenders owe to HUD.  *See* 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law.").  "The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found."

56.     A lender's due diligence should (1) "determine a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties;" and (2) "examine a property offered as security for the loan to determine if it provides sufficient collateral."  HUD Handbook 4155.1, REV-5, ch. 2-1.  Proper due diligence thus requires an evaluation of, among other things,

a borrower's credit history, capacity to pay, cash to close, and collateral. Id.

57.     In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

58.     HUD has established specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for Direct Endorsement Lenders. These requirements set forth "the minimum standard of due diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply. Id.

59.     HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C. The Direct Endorsement underwriter must assume the following responsibilities:

- compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

- the review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

- the decisions relating to the acceptability of the appraisal, the inspections, the buyer[']s capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

- the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program;

- and awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

60.     The underwriter must "evaluate the mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).

61.     When ensuring that a borrower is creditworthy, a Direct Endorsement Lender must comply with governing HUD requirements, such as those set forth in HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans).  The rules set forth in HUD

Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt. HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

62.     Direct Endorsement Lenders can underwrite an FHA-insured loan in one of two ways. First, a DE underwriter can "manually underwrite" the loan, by making the credit decision whether to approve the borrower, in accordance with HUD underwriting rules. Second, the Direct Endorsement Lender can use a HUD-approved Automated Underwriting System (AUS), a software system that makes the credit recommendation whether to approve the borrower.

63.     To "manually underwrite" an FHA-insured loan, there are numerous steps the DE underwriter must take. At a minimum, the underwriter must: (1) obtain and review the borrower's credit history; (2) obtain adequate explanations for major derogatory credit, including collections, judgments, and other recent credit problems; (3) analyze the borrower's debt obligations; (4) reject documentation transmitted by unknown or interested parties; (5) inspect documents for proof of authenticity; (6) verify the borrower's employment history; (7) establish the borrower's income stability and make income projections; (8)

ensure that the borrower has invested a minimum required amount of his or her own funds in the transaction; (9) document the source of funds invested in the transaction, including any gift funds; (10) calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and (11) consider and document any compensating factors permitting deviations from those fixed ratios. *See* HUD Handbook 4155.1.

### *Underwriting of Loans with the FHA's TOTAL System*

64.     Beginning in July 2008, HUD required Direct Endorsement Lenders to electronically process eligible loan requests through an AUS.  The AUS is a software program that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL."  Using data the lender inputs, HUD's "TOTAL" algorithm makes a credit determination and either: (i) provides an "Accept/Approve" decision, approving the loan subject to certain conditions; or (ii) provides a "Refer" decision, referring the loan back to the lender for manual underwriting.  When TOTAL approves the loan, the approval is conditioned on the lender completing certain additional underwriting steps, called "conditions."  Many of these conditions relate to ensuring the data the lender entered is true, complete, and accurate.

65.     Numerous requirements promulgated by HUD explain how lenders

must calculate each data point and what documentation they need to support each data point.

66.     For any loan approved through the use of an AUS, HUD requires the lender to certify to the integrity of the data it entered, which HUD defines as data that is true, complete, and accurate. FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  If the lender later receives or learns of information that materially differs from the information previously entered by the lender, the lender must re-submit a proposed loan to TOTAL through the AUS.

67.     The data entered into TOTAL is material to the endorsement of the loan because TOTAL is an algorithm that evaluates the overall creditworthiness of a mortgage applicant based on the data supplied by the lender.  Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS are true, complete, properly documented, and accurate." *See* FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  It is the Direct Endorsement Lender's responsibility to ensure the integrity of the data relied upon by TOTAL.  *See* Mortgagee Letter 2004-1.

68.     Because TOTAL cannot analyze data that is not available to it, certain loans are not eligible for an AUS approval and must be manually underwritten.

"A manual downgrade becomes necessary if additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a mortgage otherwise rated as an accept or approve."  FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  While a lender is not required to have a Direct Endorsement underwriter review the credit portion of an AUS approved loan, a lender must have qualified staff review AUS approvals to ensure a loan that receives an "Accept/Approve" decision is in fact eligible for an AUS approval.  *See id.*

69.    To ensure the integrity of TOTAL's decision, as well as the integrity of the data TOTAL relies upon, lenders are prohibited from "willfully manipulating ... application variables [in] TOTAL mortgage scorecard to obtain an accept/approve risk classification."  *See* Mortgagee Letter 2005-15.

70.    If TOTAL does not approve a loan with an "Accept/Approve" decision, it returns a "Refer" decision, meaning the loan is referred back to the lender for manual underwriting.  Lenders must then have a DE underwriter perform a manual underwrite and determine if the loan is approvable under FHA's manual underwriting requirements.  *See* 24 C.F.R § 203.255(b)(5)(i)(B).

*FHA's Requirements of a Quality Control Program and Mandatory Reporting*

71.     A Direct Endorsement Lender is required to maintain a quality control program to ensure the quality of its FHA-insured mortgages.  HUD requires that "[t]he Quality Control function must be independent of the [lender's] origination and servicing functions."  HUD Handbook 4060.1, REV-2, ch. 7-3.B; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.A.

72.     The quality control program must be designed to meet the goals of assuring compliance with FHA's requirements, protecting FHA from unacceptable risk, guarding against errors, omissions and fraud, and assuring swift and appropriate corrective action.  HUD Handbook 4060.1, REV-2, ch. 7-2.  The quality control program also must review a sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines.  HUD Handbook 4060.l, REV-2, ch. 7-6.C; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.D.

73.     When a lender reviews a loan file for quality control, the lender must, among other things, review and confirm specific pieces of information. For instance,"[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written reverification. Examples of items that must be reverified include, but are not limited to, the mortgagor[']s employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds."  HUD

Handbook 4060.1, REV-2, ch. 7-6.E.2.; *see also* HUD Handbook 4700.2 REV-1, ch. 6-3.A.2.

74.     If the lender finds discrepancies, it must explore them to ensure that there are no deficiencies.  "Any discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.

75.     At the end of the quality control review, the lender is expected to assess the significance of any deficiencies.  The HUD Handbook recommends a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month['] s sample to previous samples so the mortgagee may conduct trend analysis." HUD Handbook 4060.1, REV-2, ch. 7-4.

76.     HUD recommends four types of ratings. The ratings provided for this purpose are:

- "Low Risk", i.e., no problems or minor problems were identified with loan servicing or origination;
- "Acceptable Risk," i.e., the issues identified were not material to the "creditworthiness, collateral security or insurability of the loan";
- "Moderate Risk," i.e., a failure to address significant unresolved questions or missing documentation has created moderate risk for the mortgagee and the FHA; and

- "Material Risk," i.e. the issues identified were "material violations of FHA or mortgagee requirements and represent an unacceptable level of risk."

77.     Examples of "material risk" are violations that include a "significant miscalculation of the insurable mortgage amount or the applicant[']s capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud." HUD Handbook 4060.1, REV-2, ch. 7-4.D.

78.     These findings trigger mandatory reporting obligations. Mortgagees "must report [Material Risk] loans, in writing," to HUD.  *Id*.

79.     A lender is also required to report to HUD "[f]indings of fraud or other serious violations" that are discovered "during the normal course of business and by quality control staff during review/audits of FHA loans."  HUD Handbook 4060.1, REV-2., ch. 7-3.J.  The lender must report these findings, along with the supporting documentation, within 60 days of when the lender first discovers them. Id.; HUD Handbook 4060.1, REV-2, ch. 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices."). Since November 2005, Direct Endorsement Lenders such as FGMC have been required to make such reports through HUD's online Neighborhood Watch Early Warning System.  *See* Mortgagee Letter 2005-26.

80.     Internal reporting of findings is also required. Quality control review findings must "be reported to the mortgagee[']s senior management within one month of completion of the initial report" HUD Handbook 4060.1, REV-2, ch. 7-3.I.

81.     In addition to appropriate reporting, lenders must act to address the problems they identify.   "Management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify actions being taken, the timetable for their completion, and any planned follow-up activities." *Id.*; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.F.

***Certifications and Endorsements for FHA Insurance***

82.     HUD requires Direct Endorsement Lenders to certify their compliance with the foregoing due diligence, quality control, and reporting requirements.

83.     First, when a lender applies to participate in the Direct Endorsement Lender program and to endorse loans for FHA insurance on HUD's behalf, the lender must certify that it will fully comply with all HUD guidelines, regulations, and requirements:

> I certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the

National Housing Act (12 U.S.C. § 1702 et seq.) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

84.     If the lender is approved, the lender must re-certify, every year, that it is complying with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan. As of 2010, lenders are required to certify:

> I certify that I know, or am in the position to know, whether the operations of above-named lender conform to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of the lender. I certify that the lender complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, the above-named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named lender is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for the above-named lender . . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

85.     Unless the lender submits a truthful initial certification and annual certifications, the lender is not entitled to obtain or maintain its status as a Direct Endorsement Lender or to endorse loans for FHA insurance.

86.     In addition, for each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification—i.e., a certification specific to an individual loan—that the individual mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program."  Form HUD-92900-A.

87.     The "loan-level" certification differs depending on whether the lender used an AUS or manual underwriting.  For each loan that was underwritten with an AUS, the lender must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id*.  For each loan that required manual underwriting, the lender must certify that the Direct Endorsement Underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage." Id.

88.     For every loan that was approved by an FHA lender, whether through manual underwriting or the use of an AUS, an employee is required to certify:

> I, the undersigned, as authorized representative of [the lender] at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

89.     Absent the applicable certifications for an individual loan as described in the above paragraphs, the Direct Endorsement Lender cannot endorse that loan for FHA insurance.

90.     Each of the foregoing certifications is material to HUD's payment of any claim submitted under the Direct Endorsement Lender Program.  HUD does not review FHA loans for approval prior to the loan being endorsed for insurance or to paying claims in the event of a default; instead, it relies on its lenders to comply with HUD requirements and to ensure that every loan is in fact eligible for FHA insurance.  The certifications are required for each lender to enter and remain in the program. The certifications are critical to HUD's ability to ensure that only qualified and eligible loans are endorsed for HUD insurance. The certifications are essential for a claim on a loan to be submitted for FHA insurance.  And the certifications are needed to protect HUD and the FHA insurance fund from undue risk and loss.

*Defaulted Loans Result in Losses to HUD*

91.    Once a loan is endorsed by HUD or the Direct Endorsement Lender, it is insured by FHA on the basis that that the Direct Endorsement Lender has followed the HUD requirements and has submitted accurate certifications and that the loan is eligible for FHA insurance.  Without those requirements being met, the lender could not endorse the loan for FHA insurance.  It is only because a lender endorses a loan for FHA insurance that the holder of the mortgage is able to submit a claim to HUD for any losses.

92.    If the borrower defaults, the holder of the mortgage can submit a claim to HUD for any loss from the default. The holder submits a claim for insurance by using HUD's electronic claim system. The claim must include certain information. Each loan that is endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number. If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim. The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

93.    FHA pays these insurance claims in two parts. First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest.

Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (e.g., foreclosure costs), plus interest. HUD Handbook 4330.4, REV-I, ch. 2-4.

94. These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically. The system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim. After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

### *Direct Endorsement Lenders Owe Duties to HUD By Virtue of Their Authority to Endorse Loans for FHA Insurance and Their Responsibility to Ensure Accuracy*

95. HUD grants Direct Endorsement Lenders responsibility for determining which loans qualify for FHA insurance. In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor. HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

96.    As a result of this fiduciary relationship, the Direct Endorsement Lenders owe HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with HUD. These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of HUD when endorsing loans for FHA insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims.

97.    To become and remain a HUD-approved Direct Endorsement Lender, and to receive payment on claims for defaulted FHA-insured loans that it held, FGMC was required to annually certify its compliance with HUD's requirements.

98.    Upon information and belief, one of FGMC's officers or executives certified annually to HUD in sum or substance that:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies.  I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

99.    The foregoing certifications were knowingly false because, as discussed below, FGMC knew, deliberately ignored, or recklessly disregarded that

it originated and underwrote loans that were not in compliance with HUD requirements.

## FGMC'S SCHEME TO DEFRAUD HUD THROUGH DELIBERATELY AND RECKLESSLY APPROVING INELIGIBLE FHA LOANS

100.    During the relevant time period, FGMC underwrote loans it knew did not comply with FHA loan requirements and knowingly and falsely certified to HUD that it (1) used due diligence in underwriting the loans; or (2) that the data it used to approve the loans for FHA insurance had integrity and that the loans were eligible for FHA mortgage insurance.

101.    In order to approve ineligible loans, FGMC commonly utilized several tactics to approve ineligible loans.  As examples, FGMC instructed employees to "fix" loans by intentionally miscalculating or misrepresenting borrowers' income or debt obligations; manipulating the AUS/TOTAL system to predetermine the financial data points necessary to get an "Accept/Approve" rating; and hiding adverse documentation.

102.   As described below, FGMC knew, deliberately ignored, and recklessly disregarded the fact that many of its loans did not comply with FHA's underwriting requirements, and thus were not eligible for FHA mortgage insurance.

103.    Furthermore, FGMC established certain underwriting processes that it knew, deliberately ignored, or recklessly disregarded would result in FGMC endorsing materially defective loans for FHA mortgage insurance.

*FGMC's Pressure on Underwriters to Approve Ineligible Loans*

104.    As part of its scheme to approve as many FHA loans as possible, FGMC established a culture that valued getting a loan approved and endorsed for FHA insurance over compliance with FHA's rules.

105.    FGMC's goal was to approve the vast majority of loans that it was presented, even if those loans did not meet HUD's requirements to qualify for FHA insurance.

106.    To do so, FGMC created a management exception process that allowed its underwriting staff to request management approval for an exception to underwriting requirements that could not be met. As part of this process, FGMC routinely granted management exceptions to allow violations of FHA underwriting requirements. FGMC certified that each loan complied with FHA requirements, even when FGMC knew these loans did not.

107.    Where underwriters raised issues or concerns with managers, the managers directed underwriters to overlook or ignore the HUD guidelines and

rules, thus effectively training the underwriting staff to overlook or ignore the HUD guidelines and rules.

108.   FGMC's senior management was aware of the management exception process, and was often involved in the decision of whether to grant an exception requested by an underwriter.

109.   FGMC's formalized acceptance and approval of management exceptions, and the concurrent pressure by management on underwriters to approve loans, caused underwriters to view FHA's rules and requirements as mere suggestions that could be disregarded in order to close a loan and led underwriters to grant additional exceptions that were not formally tracked and did not receive management approval.

110.   While FGMC normally wanted underwriters and processors to make notes on its internal computer system as to the conditions they approved, FGMC specifically told staff not to record information in the computer system that referenced FGMC's desire to not comply with the FHA guidelines.  In other words, FGMC only wanted employees to make notes on the computer system when it would make FGMC look like it was following the guidelines.

111.    FGMC required underwriters and processors to meet certain production goals.  Underwriters who did not keep up with FGMC's quotas were criticized and had their job status put into jeopardy.

112.    Under this system, FGMC's underwriters were expressly encouraged to push through as many loans as possible, with little regard for FHA requirements in order to keep their jobs. Thus, FGMC created a culture where loan quantity was valued over the quality of the loans.

**FGMC Manipulated the AUS/TOTAL System to Predetermine Values That It Knew Would Generate "Accept/Approve" Ratings**

113.    As part of its scheme to approve every FHA loan that it was presented, FGMC instructed employees to systemically manipulate the data that was entered into FGMC's AUS/TOTAL system to determine variables that would lead to an "Accept/Approve" rating from TOTAL.

114.    As discussed above, loans that receive an "Accept/Approve" rating in the AUS/TOTAL system are subject to significantly less documentation requirements and scrutiny than loans that receive a "Refer" rating and must be manually underwritten.

115.    In order to avoid additional documentation and loan scrutiny that "Refer" ratings require, FGMC schemed to defraud HUD by predetermining data variables that would result in an "Accept/Approve" rating.

116.    When an FGMC employee initially ran a loan through FGMC's AUS/TOTAL, he or she would enter variable amounts consistent with the borrower's representations and/or the documents in the loan file.  However, if a loan received a "Refer" rating, FGMC's employees would isolate one or more variables, including most commonly the borrower's income or monthly debt obligations.

117.    FGMC employees would then systematically increase or decrease the variable(s) during successive AUS/TOTAL runs over a short period of time to identify the variable amount(s) that would result in an "Accept/Approve" rating.

118.    After identifying the qualifying variable amount(s), FGMC's employees would then use the lowest qualifying amount that they found generated an "Accept/Approve" rating to determine how to underwrite the file.

119.    Relator is aware that FGMC would manipulate the AUS/TOTAL system several times before determining financial variables that could be used to qualify a borrower for a loan on an "Accept/Approve" basis.

120.    Relator is aware that FGMC would frequently run loans multiple times using these tactics.

***Examples of FGMC's Impermissible and Fraudulent Certification of Non-Compliant FHA Loans***

121.    FGMC's false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of the FHA standards and requirements, violated FGMC's fiduciary obligations and duty of care to HUD.

122.    As set forth above, the FHA program requires a lender to represent that the underwriting conditions are met for all loans processed through the lender's system.

123.    As part of both the annual certifications and individual loan certifications, FGMC certified that they complied with the required level of quality control and duty of care.  For example, FGMC underwrote mortgages using the AUS system, and verified that all of the AUS conditions were satisfied, the loans complied with all HUD requirements, and the loans were eligible for FHA insurance.

124.    Contrary to these certifications, FGMC did not comply with the HUD requirements for approval of the loan.  FGMC ignored obvious red flags and signs

of fraud in reviewing documentation and did not use its required due diligence in underwriting FHA loans.

125.   The following are just some examples of the ways in which FGMC failed to adhere to the FHA guidelines, rules, and regulations resulting in the approval of loans that should not have qualified for FHA insurance.

126.   FGMC's underwriting staff was repeatedly told by management to "make the files work" and to "fix" any variables that would prevent a loan from being approved by the AUS system.

127.   Relator was told by FGMC's management that documents should not be an obstacle to getting loans approved.  For instance, Relator Crutcher was instructed that when the tax returns provided by borrowers did not match the tax transcripts that came directly from the IRS, that she should not worry about it and instead just use whatever income source was higher.

128.   Relator was also frequently told by FGMC's management that she should "trash" the documents that raised concerns regarding fraud or improper underwriting practices.

129.   For instance, when Relator Crutcher mentioned that there were differences in the tax return documents, FGMC's management, including underwriting manager Terri Trzybinski instructed underwriters to "trash" the

transcripts indicating a lower income to make sure that such adverse documents didn't not appear in the loan file.

130.   Relator Crutcher also observed that many of the W-2's submitted by borrowers had social security numbers that were different than the borrower's. Such a discrepancy is an obvious warning sign of fraud as a W-2 may be forged or may be for someone other than the borrower.

131.   Due to the likelihood of fraud in these circumstances, Relator Crutcher contacted her underwriting manager Terri Trzybinski on several occasions in approximately October and November 2014 to indicate that the loans could not be approved for FHA insurance due to the fact that there were strong indications of fraud.  Relator Crutcher also told FGMC that when she had worked for other banks such as Citigroup and Wells Fargo, issues related to conflicting income documents and social security numbers would automatically be flagged for follow up by the fraud departments of those lenders.

132.   In contrast, FGMC repeatedly instructed its underwriters to ignore these clear indications of fraud and appeared to pride itself on using fraudulent documents to approve loans.  Whenever Relator Crutcher identified issues of fraud, she was told to look the other way and "trash" the adverse documentation because "that's the FGMC way."   Additionally, one of Relator Crutcher's

supervisors, Jim, mentioned that FGMC stood for "Finally Got my Mortgage Closed" as a play on FGMC's initials and the way that FGMC would approve ineligible loans in ways that other lenders would not due to the FHA rules and regulations.

133.   FGMC's management, including Terri Trzybinski, also instructed underwriting staff to miscalculate income using impermissible calculations related to bonuses and overtime.

134.   Under HUD Handbook 4155.1 4.D.2.b, overtime and bonuses can be used in calculating an individual's annual income if a borrower has received that income for the past two years and it is likely to continue.  Additionally, the lender must establish that the overtime and bonus income are likely to continue.  If either type of income shows a continual decline, lenders are required to document in writing the reasons for such a decline.

135.   Despite these requirements, FGMC routinely used impermissible income calculations related to bonuses and overtime.  For example, Relator recalls that Terri Trzybinski stated that underwriters should use bonuses and overtime as a way to "make it work" and reach certain income requirements that FGMC had found the TOTAL system would rate as "Accept/Approve."

136.    However, the bonus and overtime of these borrowers would often be for less than a two-year period or would wildly fluctuate between years.  Despite this red flag, FGMC would exclude the income of the lower year and instead use two years of the higher income to make its calculation.

137.    In these instances, FGMC also failed to justify the reasons for using the income that it did, and management would instruct underwriters to perform the calculation incorrectly.

138.    The FHA guidelines also require that all sources of borrower income be documented per HUD requirements. Additionally, the FHA guidelines require Direct Endorsement lenders to ensure verification forms and documents not pass through the hands of third parties.  Contrary to these guidelines, FGMC routinely approved loans for which the income that was not properly verified (or not verified at all) and using documents that appeared to pass through the hands of a third party.

139.    FGMC's entry of a monthly debt obligations variable that lacked integrity into its AUS/TOTAL is another example of the multiple rules that FGMC violated in approving loans for FHA insurance.

140.   Under the applicable HUD rules, HUD Handbook 4155.1 4.C.3.c, the total debt-to-income ratio may not exceed 43% and the payment-to-income ratio may not exceed 31%.

141.   By lowering the monthly debt obligations to less than they actually were, FGMC approved loans where the debt-to-income ratios exceeded 43% and payment-to-income ratios exceeded 31%.

142.   Contrary to this clear requirement, FGMC failed to document adequate compensating factors even though borrowers' ratios exceeded the 31% and 41% limits.

143.   Additionally, under the FHA's program, borrowers are typically required to make a minimum down payment of 3.5% of the purchase price. However, borrowers with low credit scores may be required to make a down payment in excess of 3.5%.

144.   With respect to down payments, FGMC instructed its underwriting staff to ignore warning signs that a borrower's assets included funds that were not the borrower's.

145.   For example, borrowers would frequently claim that they had the required down payment funds in a checking or savings account. However, when FGMC's underwriters reviewed bank deposit information, it often revealed that

the requisite funds had recently been provided by a person other than the borrower (such as a family member). These are commonly referred to as "gift funds."

146. Specifically HUD Handbook 4155.1 5.B.5 requires that, in order to ensure that gift funds are not provided by a party to the sales transaction, FHA lenders must document gift funds with a gift letter, signed by the borrower, that specifies the amount of the gift, specifies that the funds are a gift requiring no repayment, and there must be documentation of the transfer of the funds from the donor to the borrower.

147. Additionally, HUD Handbook 4155.1 5.B.2.b requires that a verification of deposit, along with a recent bank statement be used to verify savings and checking accounts. If there is a large increase in the account, lenders are also required to obtain a credible explanation from the borrowers as to the source of the funds.

148. Despite these requirements, FGMC encouraged its underwriters to ignore instances in which borrowers had recent and significant deposits into their checking and savings accounts, and to instead treat the funds as if they had long existed in the borrowers' accounts. This is extremely problematic because if such funds were from an improper source (such as the seller) or if the funds were not

in fact a gift, this would substantially increase the likelihood that the buyer could not meet the loan's monthly mortgage payments and the loan would be declined.

149.   HUD Handbook 4155.1 also requires that lenders such as FGMC verify and analyze a borrower's payment history of housing obligations and to obtain written explanations as to past derogatory credit.   Despite this clear requirement, FGMC would instruct its underwriters and processors to ignore those requirements which could lead to loans being referred or declined.

150.   Similarly, FGMC also failed to properly develop credit histories for borrowers.   Under the relevant HUD rules, if a borrower does not have a credit score, HUD requires that the lender develop a credit history from alternative sources such as utility payment records, automobile insurance payments, or rental payment.

151.   Despite this requirement, underwriting manager Terri Trzybinski told Relator Crutcher and other underwriters that they could waive the requirements related to credit histories.

152.   FGMC also accepted information that was not permissible in reviewing a borrower's credit scores.   For example, FGMC frequently took credit references from unqualified credit entities such as rental companies that did not have actual credit scores.   FGMC frequently used similar credit sources to

determine a borrower's credit, despite the fact that such sources could not be used under the required due diligence standards.

153.    In the instances where FGMC did obtain additional documents, such as additional tax returns, FGMC intentionally did not review and scrutinize additional issues that those documents would raise, such as alimony or child support obligations that the borrower had failed to disclose.

154.    FGMC also encouraged underwriting staff to ignore or destroy adverse documentation that would cause a loan to be referred or declined.

155.    FGMC's management failed to take effective action to address deficiencies in its loan origination and underwriting practices.  Instead, FGMC reaped profits by certifying that the loans met FHA's standards and requirements and were therefore eligible for insurance.

*FGMC Failed to Maintain Quality Control Procedures as Required by HUD's Direct Endorsement Lender Program*

156.    Upon information and belief, FGMC further did not have a quality control department and did not review and audit loans as required by the FHA program.  As a result, many of FGMC's underwriting staff did not realize that there were serious deficiencies in the FHA loans because they did not know the FHA requirements and never received any feedback on the loans they processed.

157.    As a result of these deficiencies, FGMC's false certifications that loans complied with the FHA program's rules were material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

158.    FGMC also failed to comply with HUD's rules and regulations regarding required quality control procedures, even though those procedures were mandatory for FGMC's maintenance of its Direct Endorsement Lender status.    Instead, FGMC made false representations to HUD about FGMC's purported compliance with HUD's rules pertaining to quality control procedures.

159.    At all relevant times, FGMC was required to file annual certifications with HUD to maintain its Direct Endorsement Lender status.

160.    As part of those annual certifications, FGMC falsely certified that it had quality control procedures.

161.    In order to obtain and maintain Direct Endorsement Lender status, a lender is required to continuously implement a quality control program that is independent of its business operations.    Independence ensures that the quality control department brings its own judgment to bear in assessing the validity of loans previously made, without concern for meeting a targeted volume of business.

162.   Upon information and belief, no FGMC employees were exclusively assigned to quality control.  Even in the instances where FGMC may have had some loans reviewed or audited, FGMC did not consistently review loans nor did FGMC report to HUD findings of fraud and other serious violations, despite a HUD requirement that all such findings be reported within 60 days.

163.   FGMC deliberately avoided its quality control requirements because it viewed quality control as a detriment to loan production.   Instead of implementing quality control procedures, FGMC emphasized speed and volume and an overall focus on getting as many loans approved as possible.  FGMC sought to have virtually all employees perform underwriting and origination duties, while few, if any, employees were tasked with quality control.  This in turn resulted in loans that were likely to have significant errors.

164.   As part of its failure to maintain a proper quality control system, FGMC also ignored its obligation to provide underwriting staff with training and feedback on underwriting errors.

165.   In light of FGMC's serious and material defects in its quality control program, it would have been impossible for FGMC to truthfully complete the annual certification stating that it maintained a sufficient quality control program and thus falsely certified to HUD that it was able to participate in the Direct

Endorsement Lender program.

*FGMC's Improper Underwriting Practices Result in False Certifications and False Claims*

166. The examples discussed in this Complaint are representative examples of the systemic practices and procedures followed by FGMC that led to the submission of false statements and claims.

167. As a result of these systemic practices and procedures, FGMC made false certifications to HUD on individual loan-level, initial, and annual certifications to HUD.

168. Pursuant to the policies and practices described above, FGMC submitted the following loans to HUD that resulted in claims paid by HUD to FGMC.

a. FHA Case Number 045-7004717 for a claim submitted on approximately January 1, 2017 that was for a property located in Parlier, California that resulted in a claim to HUD in the amount of at least $131,775.52.

b. FHA Case Number 043-8253539 for a claim submitted on approximately February 29, 2016 that was for a property located in Los Molinos, California that resulted in a claim to HUD in the amount of at least $179,232.54.

c. FHA Case Number 197-3868121 for a claim submitted on approximately

October 21, 2013 that was for a property located in Monrovia, California that resulted in a claim to HUD in the amount of at least $378,571.22.

d. FHA Case Number 197-3859579 was a claim submitted on approximately September 11, 2013 for a property located in Palmdale, California that resulted in a claim to HUD in the amount of at least $280,127.42.

e. FHA Case Number 044-4339807 was a claim submitted on approximately November 12, 2010 for a property located in Fallbrook, California that resulted in a claim to HUD in the amount of at least $330,800.88.

f. FHA Case Number 045-8449590 was a claim submitted on approximately April 15, 2018 for a property located in Delano, California that resulted in a claim to HUD in the amount of at least $56,007.79.

169.   HUD paid all of the claims for loans that were falsely certified as eligible for FHA insurance.

170.   These claims were false because the loans were not eligible for FHA insurance because FGMC falsely certified that the loan was underwritten in accordance with HUD guidelines and/or FGMC falsely certified that it was in compliance with HUD's requirements when FGMC made its initial or annual certifications to HUD.

171.   The mortgages did not qualify for FHA insurance because they were

not underwritten in accordance with HUD guidelines, FGMC had not used due diligence in underwriting them, FGMC entered data into the AUS that lacked integrity, and FGMC failed to maintain a proper quality control program as required by HUD and FHA.

172.    FGMC violated HUD requirements and falsely certified to compliance with those requirements.  FGMC was therefore not authorized to endorse these mortgage loans for FHA insurance.  FGMC's false certifications and violations of HUD requirements bore upon the likelihood of whether the borrower would make mortgage payments.

173.    Upon information and belief, as a result of this conduct, FGMC submitted or caused the submission of hundreds of false claims.

**PIMCO TOOK OVER FGMC AND ENCOURAGED THE FRAUD**

174.    In September 2015, PIMCO bought the majority of FGMC and gained control over FGMC.

175.    Before PIMCO ever bought FGMC, PIMCO engaged in extensive due diligence. This included placing 2 to 3 PIMCO employees at FGMC every day for a period, holding extensive meetings with senior executives, reviewing internal FGMC documents and data, and gaining an in depth understanding of FGMC's operations.

176.   After the sale, PIMCO quickly took control. It handpicked the senior executives. It opened a new operations center in Plano, Texas and quickly began firing legacy staff, including 82 staff at the Fredrick Maryland location in 2018, and replacing the staff with new staff in Plano. For the core operations staff – underwriters, processors, and loan officers – this new staff was paid less and of a lower quality.

177.   It was made clear to FGMC staff that PIMCO was in charge. Employees were told that FGMC now had a "new rich uncle," PIMCO, backing them. Whenever PIMCO came onsite to FGMC's Plano office, which was at least once to twice a year and at time monthly, PIMCO was given the white glove treatment, with a dedicated IT staffer to ensure PIMCO had access to whatever they needed.

178.   PIMCO had such close control over FGMC that FGMC was required to transition to the communications systems used by PIMCO to ensure PIMCO could direct FGMC's actions. Prior to PIMCO purchasing FGMC, FGMC used Microsoft Teams to communicate. However, PIMCO required FGMC to obtain and use Cisco's Web Ex. FGMC configured every conference room for Web Ex capability and purchased Web Ex licenses so that PIMCO could communicate and direct FGMC using PIMCO's preferred platform.

179.    PIMCO also required FGMC executives to fly to California to meet with PIMCO.

180.    PIMCO was able to increase the originations by over 60 percent while increasing profit by 15-20 percent.

181.    PIMCO specifically built out the risk management systems. Risk management systems in part help management identify practices that could lead to scrutiny by regulators, such as the fraudulent practices outlined above.

182.    PIMCO was very involved in credit risk, i.e. the decision on what type of risk to take during underwriting. On multiple occasions, PIMCO employees met with FGMC's Director of Credit Risk, reviewed the analysis the Director of Credit Risk used to calculate credit risk, and asked questions in order to fully understand the responsibilities and work of credit risk.

183.    PIMCO received reports regarding buyback and indemnifications FGMC had to execute – i.e. specific loans where FGMC violated underwriting or other requirements and had the repurchase or indemnify the purchaser of the loan.

184.    PIMCO was so involved that it received daily reports on FGMC's operations. PIMCO decided what software and other infrastructure to upgrade and what not to.

185.    PIMCO was specifically interested in mortgages that did not meet

standard underwriting requirements and instead had an appetite for riskier mortgages that many lenders refused to originate. The delinquency and foreclosure rates for FHA loans that FGMC originated and underwrote were regularly higher than FHA averages. Higher delinquency and foreclosure rates indicate FGMC was underwriting and approving the exact riskier mortgages PIMCO desired.

186.   PIMCO continued to control the operations of FGMC. PIMCO picked the new CEO, an individual PIMCO used to conduct due diligence on its initial decision to purchase FGMC. PIMCO directed the major actions of FGMC including the decisions on downsizing.

187.   As one example of PIMCO's control, PIMCO directed FGMC to hire former PIMCO employee Brian Hale. Hale attended all executive meetings and provided executive coaching to FGMC's CEO. Hale helped select FGMC's new Chief Operations Officer, Lindblom, as well as executives Jordan Simons, Tracey Fenton, and Darien Oien. FGMC executives recognized that the people Hale directed FGMC to hire were untouchable. Hale also oversaw the restructuring of all operations and sales compensation plans.

188.   PIMCO also controlled FGMC's Board of Directors and had at least two seats on the Board of Directors. The Board of Directors received a quarterly

report that included Quality Control audits that would have identified the problems with underwriting that FGMC identified.

189.    PIMCO continues to control FGMC. PIMCO owns 100 percent of FGMC's equity. PIMCO provided the bridge loan to FGMC to help it through bankruptcy. PIMCO provided a backstop to a $25 million warehouse line of credit of FGMC.

190.    Through the above actions, PIMCO exercised its control over FGMC and directly caused the false certifications and false claims of FGMC.

191.    Additionally, PIMCO's extensive direction of and involvement in FGMC's day-to-day management meant that FGMC served as PIMCO's alter ego. *See Thermolife Int'l, LLC v. Hi-Tech Pharms., Inc.*, 2018 U.S. Dist. LEXIS 223732 at *8-9 (N.D. Ga. Oct. 30, 2018) (listing the factors that the Eleventh Circuit states a plaintiff must show to establish the alter ego doctrine).

   a. PIMCO disregarded that FGMC was a separate corporate entity and made it a mere instrumentality for the transaction of their own affairs;

   b. a unity of interest and ownership, through placement of PIMCO personnel on the board and control over FGMC's CEO, made it such that the separate personalities of FGMC and

PIMCO ceased to exist;

c.  and, here, adhering to the doctrine of corporate entity would promote injustice and protect the fraud associated with PIMCO's direction of FGMC's scheme to defraud the United States.

192.   Accordingly, PIMCO abused the corporate form by disregarding the separateness of FGMC and PIMCO through the commingling of funds on an interchangeable and/or joint basis, as well as by confusing the otherwise separate properties, records, and control of the two entities. Therefore, PIMCO should not receive the protections of the corporate veil.  *See id.* at *9 (laying out factors that courts in the Eleventh Circuit look to in order to justify piercing the corporate veil).

## FGMC IMPROPERLY RETALIATES AGAINST RELATOR CRUTCHER

193.   As discussed further herein, during her employment with FGMC, Relator Crutcher discovered multiple instances of mortgage fraud that led her to believe that FGMC was falsely certifying loans for FHA insurance that did not meet the HUD and FHA requirements for mortgage insurance.

194.   Relator Crutcher attempted to raise her concerns internally with FGMC, but her complaints were repeatedly ignored by FGMC's management.

195.   For example, in approximately October 2014, Relator Crutcher sent

her underwriting manager, Terri Trzybinski several emails indicating that fraud was being committed due to the fact that FGMC was waiving conditions that were required for FHA insurance.  Relator Crutcher also indicated that since many of the W-2s that FGMC used to approve loans had mismatching Social Security Numbers, FGMC had not performed the required due diligence to identify clear instances of fraud.

196.   Relator Crutcher also indicated both in these emails and verbally that she would not approve these loans due to the fact that they did not meet the FHA guidelines and that FGMC was using improper documents and calculations in order to get the loans approved.

197.   In her emails, Relator Crutcher also asked Ms. Trzybinski whether FGMC had a fraud department that could review the loans that were being approved by FGMC's process of waiving conditions.

198.   Despite Relator Crutcher's complaints that FGMC was engaged in FHA mortgage fraud, FGMC brushed off Relator Crutcher's complaints. Ms. Trzybinski merely responded that FGMC did not have a fraud department, and responded that Relator Crutcher should only worry about approving loans and not about compliance.

199.   Shortly after making these internal complaints to Ms. Trzybinski,

Relator Crutcher was terminated by FGMC on or about November 10, 2014.

200.    Relator Crutcher's termination was in retaliation for her protected complaints about FGMC's fraud against the government and for her refusal to engage in further fraud against the government.

201.    FGMC unlawfully discharged and discriminated against Relator Crutcher because of the lawful acts she had undertaken in further of the False Claims Act.

**FIRST CAUSE OF ACTION**
***For Damages and Penalties Under the False Claims Act***
**31 U.S.C. § 3729(a)(1)(A)**
**(As to All Defendants)**

202.    Plaintiff-Relator repeats and realleges the allegations above as if fully set forth herein.

203.    Defendants violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(l)(A) by: (i) knowingly presenting or causing to be presented claims for payment or approval; (ii) in order to get false or fraudulent claims paid; and (iii) which claims the United States did pay.

204.    The United States paid the false or fraudulent claims because of Defendants' acts and incurred damages as a result.

**SECOND CAUSE OF ACTION**
*For Damages and Penalties Under the False Claims Act*
**31 U.S.C. § 3729(a)(1)(B)**
**(As to All Defendants)**

205.     Plaintiff-Relator repeats and realleges the allegations above as if fully set forth herein.

206.     Defendants violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records, or statements: (i) material to false or fraudulent claims for payment to HUD; and/or (ii) in order to get false or fraudulent claims paid; and (iii) which claims the United States did pay.

207.     The United States paid the false or fraudulent claims because of FGMC's acts and incurred damages as a result.

**THIRD CAUSE OF ACTION**
*Unlawful Retaliation Under the False Claims Act*
**31 U.S.C. § 3730(h)**
**(As to FGMC)**

208.     Plaintiff-Relator realleges the above paragraphs as if fully restated herein.

209.     This is a claim for back pay, interest on the back pay, front pay, compensation for special damages, and such other and further relief as the Court may deem proper for injuries Relator sustained as a result of retaliatory actions

taken against Relator by Defendant, including litigation costs and reasonable attorneys' fees.

210.     31 U.S.C. § 3730(h) provides, in relevant part:

(h) Relief From Retaliatory Actions.

(1)     . . . Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

(2)     . . . Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. . . .

211.     Through the acts described above, Relator repeatedly attempted to stop Defendant from committing violations of 31 U.S.C. § 3729.

212.     Relator's acts described above, undertaken to stop Defendants from committing countless violations of 31 U.S.C. § 3729(a), consisted of protected conduct under 31 U.S.C. § 3729 *et seq.* Relator repeatedly raised concerns with Defendant's management that Defendant was engaging in fraud and submitting

false claims to the Government.  Defendant was aware of Relator's protected conduct and acted in retaliation as a result of Relator's protected conduct under the False Claims Act.

213.    Through the acts described above, Defendant repeatedly ignored and/or refused to provide any meaningful response to Relator's lawful inquiries and efforts to redress Defendant's intentional and knowing violations of HUD and the FHA's underwriting requirements and the submission of false claims for mortgage insurance by HUD.

214.    As a direct result of Relator's lawful inquiries and efforts to stop intentional and knowing violations of HUD and the FHA's rules and regulations, Defendant unlawfully terminated Relator because of lawful acts done by Relator in furtherance of her efforts to stop Defendant from submitting false claims.

215.    Defendant is liable under 31 U.S.C. § 3730(h) for (i) an award of double back pay; (ii) interest on back pay; (iii) an award of front pay; (iv) special damages; (v) litigation costs; (vi) attorneys' fees; and (vii) such other and further relief as the Court may deem proper.

**WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:**

a.   A judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' violations of the False Claims Act;

b.   A judgment against Defendants for civil penalties as described (and adjusted for inflation) under 31 U.S.C. § 3729(a) (1)(G) for each of Defendants' violations of the False Claims Act;

c.   That Relator recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

d.   That Relator be awarded all reasonable attorneys' fees in bringing this action;

e.   That, because the United States Government did not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

f.   An award against FGMC to Relator on her retaliation claims including double back pay; interest on back pay; an award of front pay; litigation costs; attorneys' fees; special damages; an injunction restraining further retaliation; reinstatement of Relator's position; reinstate of full fringe benefits and seniority rights; compensation for lost wages, benefits, and seniority rights; and other remuneration.

g.   That a trial by jury be held on all issues so triable;

h.   An award of pre-judgment interest; and

i.   Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Dated: January 11, 2022

By:    */DRAFT/*_____

J. Nelson Thomas, Esq. (to be admitted *pro hac vice*)

Jonathan W. Ferris, Esq. (to be admitted *pro hac vice*)

**THOMAS & SOLOMON LLP**

693 East Avenue

Rochester, New York 14607

Telephone: (585) 272-0540

nthomas@ theemploymentattorneys.com

jferris@theemploymentattorneys.com

Julie K. Bracker

Georgia Bar No. 073803

Jason Marcus

Georgia Bar No. 949698

**BRACKER & MARCUS LLC**

3225 Shallowford Road

Suite 1120

Marietta, GA 30062

Telephone: (770) 988-5035

Fax (678) 648-5544

Julie@FCAcounsel.com

Jason@FCAcounsel.com

*Attorneys for Relator*

```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                                    .   Chapter 11
    IN RE:                          .
                                    .   Case No. 22-10584(CTG)
    FIRST GUARANTY MORTGAGE         .
    CORPORATION, et al,             .
                                    .   824 Market Street
                    Debtors.        .   Wilmington, Delaware 19801
                                    .
    . . . . . . . . . . . . . . . . .   Monday, October 31, 2022

                    TRANSCRIPT OF VIDEO HEARING
               BEFORE THE HONORABLE CRAIG T. GOLDBLATT
                   UNITED STATES BANKRUPTCY JUDGE

    APPEARANCES:

    For the Debtors:            Laura Davis Jones, Esq.
                                Timothy P. Cairns, Esq.
                                Mary F. Caloway, Esq.
                                PACHULSKI, STANG, ZIEHL
                                 & JONES, LLP
                                919 North Market Street
                                17th Floor
                                Wilmington, Delaware 19899

                                Samuel R. Maizel, Esq.
                                Tania M. Moyron, Esq.
                                DENTONS US, LLP
                                601 South Figueroa Street
                                Suite 2500
                                Los Angeles, California 90017




    (Appearances Continued)

    Audio Operator:            Electronically Recorded
                               by Theresa Mistretta, ECRO

    Transcription Company:     Reliable
                               1007 N. Orange Street
                               Wilmington, Delaware 19801
                               (302)654-8080
                               Email:  gmatthews@reliable-co.com


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.
```

```
APPEARANCES VIA ZOOM:

For the Debtors:              Rebecca Weeks, Esq.
                              Sam Alberts, Esq.
                              Lee Smith, Esq.
                              DENTONS (US) LLP

For Roosevelt Management
Company and Rushmore Loan
Management Services, LLC:     Eric Monzo, Esq.
                              MORRIS JAMES, LLP

                              Matthew Linder, Esq.
                              Kyle Ferrier, Esq.
                              WHITE & CASE, LLP

For Sourcepoint:              Jennifer McLemore, Esq.
                              WILLIAMS MULLEN

For the United States:        Leah Lerman, Esq.
                              Mary Schmergel, Esq.
                              U.S. DEPARTMENT OF JUSTICE

For Massachusetts Mutual
Life Insurance Company:       J.R. Smith, Esq.
                              Justin Paget, Esq.
                              HUNTON ANDREWS KURTH, LLP

For Barclays:                 Jennifer Wuebker, Esq.
                              HUNTON ANDREWS KURTH, LLP

For PIMCO:                    Nancy Peterman, Esq.
                              GREENBERG TRAURIG, LLP

For Flagstar Bank, FSB:       Robert Dehney, Esq.
                              Tori Remington, Esq.
                              MORRIS, NICHOLS, ARSHT
                               & TUNNELL, LLP

                              Charlie Liu, Esq.
                              Jennifer Feldsher, Esq.
                              MORGAN, LEWIS & BOCKIUS, LLP


(Appearances Continued)
```

1    is -- requires such guesswork that there isn't a basis to

2    come up with any other number.  And so that's entirely

3    without prejudice to what the merits will be.  I'm not saying

4    the claim is worthless, I'm saying I can't tell what it's

5    worth and, without it, any other number would be made up.

6         And that doesn't -- again, there is a hard question

7    of why a lawyer's best guess at what a number between zero

8    and infinity is should necessarily be zero.  But it seems to

9    me, under these circumstances, when you're thinking about

10   affecting other parties' votes and the like, that estimating

11   a claim at one dollar in light of the record in front of me,

12   all of which is so speculative about what -- about both the

13   merits of the claim, as well as the quantification of

14   damages, is appropriate on this record and is supported by

15   the practice in mass tort cases where you've got claims, some

16   of which we know are valid, but where the principal recovery

17   will come out of insurance, therefore, not -- sort of not by

18   -- that any insurance isn't part of the estate, but separate

19   assets from the ones that other creditors are claiming

20   against of allowing claims for one dollar for that purpose.

21   So I'm satisfied that that's appropriate.

22        With respect to the motion for relief from stay, it

23   doesn't seem to me you've got a sufficiently ripe need for

24   stay relief.  You've got a proof of claim that you filed that

25   can be addressed to the claims allowance process.  You've

1   opted out of the third-party releases, which means nothing in

2   the bankruptcy case -- before confirmation, the automatic

3   stay isn't stopping you from chasing third parties.  Post-

4   confirmation, there isn't going to be any release that stops

5   you from cashing third parties.

6           To the extent a court somewhere else says, no, you

7   can't chance this third-party because the debtor is an

8   indispensable party, you can then come back and say I need to

9   name them a nominal party.  If you want to take discovery or

10   the like -- if you run into an issue that's a concrete,

11   ripened issue, it's entirely without prejudice to your rights

12   to come in and ask for relief as you need it.  But I don't

13   see a ripe dispute today that requires stay relief, so that's

14   -- so I'm going to deny it on that basis.

15           MR. HUSTON:  And our requested language in the

16   plan?

17           THE COURT:  I don't think that, beyond the carveout

18   from the third-party release, there's -- that it's necessary

19   or appropriate to grant the sort of blanket carveout.  If

20   you've got some more specific -- and I'll look again at your

21   objection and see if there's something I'm missing and I'll -

22   - I -- before ruling today, I'll take a closer look at that.

23           But to me, if you've got some -- if you point to

24   some thing that the plan does to you that is inconsistent

25   with the Code, I want to protect you from that.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| United States of America;<br>*ex rel.* KARI CRUTCHER,<br><br>    Plaintiff,<br><br>  v.<br><br>FIRST GUARANTY MORTGAGE<br>CORPORATION,<br><br>PACIFIC INVESTMENT<br>MANAGEMENT COMPANY LLC,<br><br>PIMCO INVESTMENTS LLC,<br><br>AARON SAMPLES,<br><br>ANDREW PETERS<br><br>JILL WINTERS,<br><br>and SUZY LINDBLOM.<br><br>    Defendants. | Civil Action No. 16-CV-03812-SCJ |

**Samuel J. Buffone, Jr.,** under penalty of perjury deposes and states:

1.      I am a partner with the law firm Black & Buffone PLLC, and as such I am knowledgeable and familiar with the facts of this matter.

2.      I submit this affirmation in support of Relator's response in opposition to Defendants Pacific Investment Management Company LLC's and PIMCO Investments LLC's Motion to Dismiss and Cross-Motion for Leave to File a Second Amended Complaint.

3.      On January 10, 2023, I sent a proposed amended complaint to Craig Gillen, Anthony Lake, Peter White, and Noah Gillespie, counsel for Defendants Pacific Investment Management Company LLC and PIMC Investments LLC (collectively PIMCO) stating our intention to file a cross-motion to amend and requesting PIMCO's consent.

4.      On January 11, 2023, counsel for PIMCO stated PIMCO does not consent.

5.      We have attached to our cross motion to amend the complaint a true and correct copy of the amended complaint we will file if the Court grants our motion.

6.      To the extent that either PIMCO or the Court identifies any deficiency in our proposed amended complaint, we respectfully request the opportunity to cure those defects through an amended complaint.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 11, 2023.


                                          /s/ Samuel J. Buffone Jr.
                                          Samuel J. Buffone, Jr.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN G. DOUGHERTY,<br><br>                          Plaintiff,<br><br>v.<br><br><br>GUILD MORTGAGE COMPANY,<br><br>                        Defendant,<br><br><br>UNITED STATES OF AMERICA,<br><br>                        Intervenor. | Case No.  16cv2909-JAH (BLM)<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS (Doc. No. 110) INTERVENOR'S AMENDED COMPLAINT** |

## INTRODUCTION

Pending before the Court is Defendant Guild Mortgage Company's ("Guild") motion to dismiss Intervenor United States' ("United States") first amended complaint ("FAC") (Doc. No. 107) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Doc. No. 110.  The United States filed a response in opposition.  The motion is fully briefed.  After careful review of the pleadings, and for the reasons set forth below,  Guild's motion to dismiss the United States' FAC is **DENIED**.

1

## **BACKGROUND**

1
2      The Federal Housing Administration ("FHA") is an entity within the United States
3  Department of Housing and Urban Development ("HUD") that promotes American
4  homeownership through insuring home loans.  <u>Doc. No. 20 at</u> pg. 5.  Authorized by the
5  National Housing Act of 1934, the FHA agrees to protect mortgage lenders against the risk
6  of loss caused by borrowers' default and non-payment.  <u>12 U.S.C. § 1701</u>.  In order to
7  underwrite FHA insured mortgages on HUD's behalf, a lender must first apply to become
8  a Direct Endorsement Lender ("DE Lender").  <u>Id.</u> at pg. 13.  The FHA's Direct
9  Endorsement program ("DE program") handles these applications, and all applicants must
10  be approved by HUD.  <u>Id.</u>  Certain DE Lenders participate in the Lender Insurance ("LI")
11  program where DE Lenders personally endorse mortgages for FHA insurance and retain
12  all documents.  <u>Id.</u> at pgs. 13-14.  Once a loan is endorsed by HUD or a DE Lender, the
13  loan is insured by the FHA.  Thus, if a homeowner defaults on an FHA-insured mortgage,
14  HUD will reimburse the lender for both the outstanding balance on the loan and other costs
15  associated with the default.  <u>Id.</u> at pgs. 12-13.  This "no-loss-guarantee" incentivizes
16  lenders to grant loans to worthy applicants with low to moderate incomes and serves as an
17  alternative to conventional financing.  <u>Id.</u>

18      There are two ways that a DE Lender can underwrite an FHA-insured loan.  One, a
19  DE Lender can "manually underwrite" a loan, in accordance with HUD underwriting rules,
20  and make a decision on extending credit to the borrower.  Two, a DE Lender can use a
21  HUD-approved Automated Underwriting System ("AUD"), a software system that makes
22  credit recommendations.  <u>Id.</u> at pg. 19.  Beginning in July 2008, HUD took away the ability
23  to make this choice and began requiring DE Lenders to electronically process eligible loan
24  requests through an AUD.  <u>Id.</u> at pg. 20.  The AUD connects to a proprietary HUD
25  algorithm known as Technology Open to Approved Lenders ("TOTAL").  <u>Id.</u>  Using data
26  that the lender puts in an AUS, the TOTAL algorithm makes a credit determination and
27  either approves, subject to certain conditions, or refers the loan.  <u>Id.</u>  Approved loans are
28  only eligible for FHA's insurance endorsement if the data entered into the AUS is true,

16cv2909-JAH (BLM)

complete, and accurate.  Id.  When the TOTAL algorithm refers a loan, the loan goes back to the lender for manual underwriting.  Id.

For each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification that the individual mortgage "complies with HUD rules and is 'eligible for HUD mortgage insurance under the DE program.'"  Id. at pg. 26 (quoting Form HUD–92900–A).  The certification differs depending on whether the loan was manually underwritten or the lender used an AUS.  Id.  For each loan that was underwritten using AUS, HUD requires the lender to certify to the "integrity of the data supplied by the lender used to determine the quality of the loan."  Id.  For a loan that required manual underwriting, the lender must certify that the underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and has used due diligence in underwriting the mortgage."  Id.

Guild is a California corporation that originates and underwrites residential mortgage loans for properties throughout the United States.  Id. at pg. 9.  Guild has been participating in the DE Lender program since 1984 and in the LI program since 2007.  As of May 2016, HUD paid claims totaling almost $300 million on at least 1,691 mortgages endorsed by Guild.  Id. at pg. 29.

Plaintiff Kevin Dougherty ("Dougherty") began working for Guild as its Quality Assurance ("QA") manager in 2010.  Doc. No. 27 at pg. 2.  Dougherty learned that between 2006 and 2012, Guild had failed to report loans to HUD that presented material risk and "[f]indings of fraud or other serious violations" discovered during the "normal course of business and by quality control staff during reviews/audits of FHA loans."  Id. at pgs. 3-4.  Such reporting is required by HUD guidelines within 60 days of discovery.  Id. (quoting HUD Handbook 4060.1, REV-2, ch. 7-3.J, 7-4.D; HUD Handbook 4060.1, REV-2, ch. 2-23).  Dougherty brought these defective loans to the attention of senior management at a bi-monthly Audit Committee meeting and was specifically told not to report any defective loans to HUD without senior management approval.  Id. at pg. 4.  Dougherty became increasingly concerned about Guild's failure to report defective loans to HUD and

| | |
|---|---|
| 1 | management's refusal to change Guild's faulty loan origination and underwriting practices. |
| 2 | Id. at pgs. 4-5. |
| 3 | On December 3, 2013, Dougherty filed a complaint against Guild. Id. After filing |
| 4 | this initial complaint, the Department of Justice, along with HUD and its Office of |
| 5 | Inspector General, commenced an investigation into Guild's origination and underwriting |
| 6 | of single family residential mortgages insured by the FHA. Doc. 40 at pg. 11. In January |
| 7 | 2014, Guild received a subpoena from the United States Department of Justice. Doc. No. |
| 8 | 27 at pg. 5. Lisa Klika ("Klika"), Guild's Senior Vice President of Compliance and Quality |
| 9 | Assurance, made comments that led Dougherty to believe that Klika suspected Dougherty |
| 10 | was responsible for the subpoena. Id. at pg. 5. Following Klika's comments, Dougherty |
| 11 | received decreased marks on his performance review despite Dougherty's steady, |
| 12 | unchanging performance. Id. at pgs. 5-6. On April 9, 2014, Dougherty filed a first |
| 13 | amended complaint See Doc. No. 5. |
| 14 | In August 2014, Dougherty was given a project relating to Guild's response to the |
| 15 | government investigation. Id. at pgs. 6-7. Shortly after the project was completed, Klika |
| 16 | determined the project was done incorrectly, and another employee, McIntosh, took |
| 17 | responsibility for the mistake. Id. A few days later, on August 19, 2014, Klika terminated |
| 18 | Dougherty, effective immediately. Id. at pg. 7. Klika justified Dougherty's termination by |
| 19 | asserting that the mistake in the project and Dougherty's purported lack of responsibility |
| 20 | had led to an erosion of confidence in Dougherty's management abilities. Id. Dougherty |
| 21 | asserts he was terminated because he engaged in protected activity under 31 U.S.C. § 3730 |
| 22 | (h)(1) and not because his performance. Id. On September 8, 2014, Dougherty filed a |
| 23 | second amended complaint. See Doc. No. 8. |
| 24 | On May 18, 2016, the United States filed a complaint in intervention against Guild. |
| 25 | See Doc. No. 20. On May 26, 2016, Dougherty filed his third amended complaint (TAC) |
| 26 | alleging retaliation in violation of the FCA. Doc. No. 27 at pgs. 7-8. On November 29, |
| 27 | 2016, Guild's motion to transfer venue (Doc. No. 32) was granted, and the case was |
| 28 | transferred to the Southern District of California. On June 8, 2017, this Court took the |

4

pending Motion to Dismiss under submission pursuant to Civil Local Rule 7.1.d.1. See Doc. No. 89. On March 4, 2019, the United States filed a first amended complaint (FAC). See Doc. No. 107. Guild filed a motion to dismiss the United States' FAC on March 22, 2019. See Doc. No. 110. On April 12, 2019 the United States filed a response in opposition to Guild's motion. See Doc. No. 113. Guild filed a reply to the United States' response on April 24, 2019. See Doc. No. 116.

## DISCUSSION

### I. Legal Standard

#### a. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or fails to allege sufficient facts to support a cognizable legal theory. Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the factual allegations permit "the court to draw the reasonable inference that the Guild is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In other words, "the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the Dougherty to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

In reviewing a motion to dismiss under Rule 12(b)(6), a court must assume the truth of all factual allegations and construe the factual allegations in the light most favorable to the nonmoving party. Cahil v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996). However, legal conclusions need not be taken as true merely because they are "cast in the

1  form of factual allegations." Ileto v. Glock Inc., 349 F.3d 1191, 1200 (9th Cir. 2003). "Nor

2  does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

3  enhancement.'" Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 557). The court may

4  consider facts alleged in the complaint, documents attached to the complaint, documents

5  relied upon but not attached to the complaint when authenticity is not contested, and

6  matters of which the court takes judicial notice. Lee v. City of Los Angeles, 250 F.3d 668,

7  688-89 (9th Cir. 2001). If a court determines that a complaint fails to state a claim, the court

8  should grant leave to amend unless it determines that the pleading could not possibly be

9  cured by the allegation of other facts. Doe v. United States, 58 F.3d 494, 497 (9th Cir.

10 1995).

11 ### b.  Federal Rules of Civil Procedure 8

12       Rule 8 of the Federal Rules of Civil Procedure provides that in order to state a claim

13 for relief in a pleading it must contain "a short and plain statement of the grounds for the

14 court's jurisdiction" and "a short and plain statement of the claim showing that the pleader

15 is entitled to relief." Fed.R.Civ.P 8(a)(1)&(2). "The pleading standard Rule 8 announces

16 does not require 'detailed factual allegations,' but it demands more than an unadorned, the

17 Guild-unlawfully-harmed me accusation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550

18 U.S. at 555).

19 ### c.  Federal Rules of Civil Procedure 9(b)

20       Under Rule 9(b) of the Federal Rules of Civil Procedure, "[i]n alleging fraud or

21 mistake, a party must state with particularity the circumstances constituting fraud or

22 mistake." Under Ninth Circuit case law, Rule 9(b) imposes two distinct requirements on

23 complaints alleging fraud. First, the basic notice requirements of Rule 9(b) require

24 complaints pleading fraud to "state precisely the time, place, and nature of the misleading

25 statements, misrepresentations, and specific acts of fraud." Kaplan v. Rose, 49 F.3d 1363,

26 1370 (9th Cir. 1994); see also Vess v. Ciba-Geigy Corp., U.S.A., 317 F.3d 1097, 1106 (9th

27 Cir. 2003) (citation omitted) (stating that a plaintiff must set forth the "who, what, when,

28 where and how" of the alleged misconduct). Second, Rule 9(b) requires that the complaint

"set forth an explanation as to why the statement or omission complained of was false or misleading." <u>Yourish v. California Amplifier</u>, <u>191 F.3d 983, 993</u> (9th Cir. 1999) (citation and quotation omitted).

## II.    Analysis

The United States' FAC asserts four causes of action for violations of: (1) The False Claims Act (<u>31 U.S.C. §3729(A)(1)</u> (2006) and <u>31 U.S.C. §3729(A)(1)(A)</u> (2010)); (2) The False Claims Act (<u>31 U.S.C. §3729(A)(1)(B)</u> (2010) (formerly <u>31 U.S.C. §3729(A)(2)</u> (2006)); (3) breach of fiduciary duty; and (4) breach of contract. <u>See</u> <u>Doc. No. 107</u>.

### a.   False Claims Act Causes of Action

Guild argues that the United States has not properly alleged a scheme to submit false claims. <u>Doc. No. 110-1 at</u> pg. 12. Specifically, Guild contends that the United States "fails to provide any particulars about the scope and implementation of the scheme or identify the specific FHA requirements the scheme was designed to flout." <u>Id.</u> Guild asserts that the United States is only able to allege that Guild's work, in hindsight, was "imperfect," but does not establish falsity. <u>Id.</u> at pgs. 12-13. Guild argues that the United States' allegations "do not provide the level of detail required for Guild to be on notice of how FCA liability may attach to an individual FHA-insured loan or be able to identify the FHA loans subject to the Amended Complaint." <u>Id.</u> at pg. 13. Guild contends that the United States fails to reference any requirements for an actual claim for insurance proceeds made to HUD and doesn't identify any specific statements from the claim form. <u>Id.</u> at pgs. 16-17. Guild argues that the United States fails to properly plead the elements required to establish promissory fraud or implied false certification. <u>Id.</u> at pgs. 19-20. Specifically, Guild asserts that the United States needed to plead that Guild acted with a specific intent to perpetuate knowing, willful fraud. <u>Id.</u> at pg. 20. Guild argues that the United States fails to allege materiality because "the Government fails to allege which specific statutory, regulatory, or contractual requirements were violated." <u>Id.</u> at pg. 25. Guild also argues that the requirements implicated by the United States are not material "because HUD not only consistently pays claims where it knows there is or may be a violation of its

regulations, but it allows companies it knows have violated regulations to continue originating FHA-insured loans." Id. at pg. 34. Guild asserts that the United States doesn't present facts to meet the FCA's scienter element nor does the United States show that Guild acted recklessly. Id. at pg. 37. Guild argues that proving "[c]ollective knowledge, wherein the states of mind of multiple individuals is aggregated to infer corporate intent, is not sufficient." Id. at pg. 38. Guild contends that the United States does not allege that Guild was aware of any regulatory violations on any loan before certification on the loan-level application for insurance. Id.

In response, the United States argues that it has sufficiently pled Guild's violation of the FCA by pleading the "who," "what," "when," "where," and "how" necessary to state a claim for fraud. Doc. No. 113 at pgs. 16-20. The United States asserts that Guild's falsities are actionable both under an implied certification theory and promissory fraud theory. Id. at pgs. 21-28. The United States contends that "Guild being a DE lender knew, or should have known, that the certifications of compliance it made at the time of endorsement were false because the falsities were facially apparent from the loan files that it was required to underwrite in accordance with HUD's requirements. Id. at pg. 27. The United States argues that it has sufficiently pled the materiality of Guild's fraud. Id. at pg. 30. The United States contends that its amended complaint "sets forth the rationale for the requirements and how they are critically important to FHA lending." Id. at pg. 31. The United States specifically alleges that "[t]he entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found." Id. The United States argues that it sufficiently pled Guild's knowledge of the violation of the FHA requirements Guild certified. Id. at pg. 37. The United States contends that the complaint makes plausible allegations of Guild's scienter because the detailed allegations of Guild's knowledge and recklessness satisfy the standard. Id. at pgs. 37-38. The United States alleges that "the Complaint details Guild's practice of falsely certifying compliance with material FHA requirements and causing false claims to be

8

1  submitted to, and paid by, HUD when Guild's improperly-underwritten mortgages
2  defaulted.  Id. at pg. 39.

3       The Court finds that the United States sufficiently alleges the "who, what, where,
4  how, and why" of Guild's misconduct.  The pleadings allege with specificity how Guild
5  "knew, or should have known, that the certifications of compliance it made at the time of
6  endorsement were false because the falsities were facially apparent from the loan files that
7  it was required to underwrite in accordance with HUD's requirements."  Id. at pg. 27.  The
8  United States sets forth which requirements are critically important to FHA lending and
9  demonstrates how Guild's scheme knowingly violated the requirements.  Id. at pgs. 31-37.
10 The United States also shows, through detailed allegations of Guild's knowledge and
11 recklessness, that its Amended Complaint satisfies the scienter standard.  Id. at pgs. 37-38.
12 Thus, the Court finds that the United States' Amended Complaint demonstrates that the
13 United States has plead with particularity sufficient to meet the 9(b) heightened standard.

14       **b.  Breach of Fiduciary Duty**

15       Guild argues that the United States' fiduciary claim fails because Congress has
16 already provided guidance through extensive statutory and regulatory framework for
17 enforcing the obligations of FHA-approved lenders.  Doc. No. 110-1 at pg. 42.  Guild
18 contends that because of HUD's "administrative enforcement regime to ensure compliance
19 with program requirements and the general presumption against federal common law, the
20 Government must show any 'few and restricted instances' where common law is necessary
21 in this case – which it cannot."  Id.

22       In response, the United States asserts that Guild is incorrect in claiming that common
23 law is unnecessary to show a breach of fiduciary duty.  Doc. No. 113 at pg. 42.  The United
24 States contends that although Guild asserts that the fiduciary claim is preempted by HUD's
25 regulatory regime, Guild does not identify any statute that would have such a preclusive
26 effect.  Id. at pgs. 42-43.

27       The Court finds that Guild fails to address whether the United States' allegations in
28 its Amended Complaint state a facially plausible claim.  See Iqbal, 556 U.S. at 678.

9

Although Guild asserts that such a breach of fiduciary duty claim is preempted, Guild does not identify a federal statute that preempts the United States' claim. The United States, in support of its assertion that federal common law recognizes a breach of fiduciary duty claim, cites to numerous federal court cases. Doc. No. 113 at pg. 42. The Court finds that the United States demonstrates that here, this is one of the "few and restricted instances" where federal common law is necessary. Thus, the Court finds that the United States has sufficiently pled its breach of fiduciary claim.

### c. Breach of Contract

Guild argues that the United States "fails to allege which contract or contracts it thinks were violated," and also "fails to identify any specific provision or how Guild breached it." Doc. No. 110-1 at pg. 43. Guild asserts that the United States' pleadings as to causation are "too vague and speculative." Id. Guild argues that the United States does not sufficiently allege that Guild caused the defaults, and based upon the pleadings, it is impossible to discern how Guild breached the FHA requirements. Id. at pgs. 42-43.

In response, the United States asserts that a claim can be false under numerous theories, including "when [a claim] is submitted on a contract induced by falsities or fraud…." Doc. No. 113 at pg. 17. The United States argues that liability for claims submitted under a contract will attach "when the contract of extension of government benefit was originally obtained through false statements or fraudulent conduct." Id. at pg. 25 (quoting United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1170 (9th Cir. 2006)).

The Court finds that the United States sufficiently pled its breach of contract claim. The United States asserts that "Guild entered into a contract with HUD for each loan that it endorsed for FHA mortgage insurance" and "[u]nder the terms of that contract, in committing FHA insurance to the loan Guild represented it complied with, and obligated it itself to comply with FHA origination, underwriting, endorsement, and other insurance requirements." Doc. No. 107 at pg. 99. The United States contends that Guild breached this contractual obligation by not complying with FHA requirements during the Lending

10

Time Period.  Id.  The United States argues that as a result of these actions, "HUD has paid insurance claims, and incurred losses, relating to hundreds of FHA-insured loans wrongfully endorsed by Guild."  Id.  The court may consider facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice.  Lee, 250 F.3d at 688-89.  In viewing the totality of the facts in the light most favorable to the United States, the Court finds that Guild breached its contractual obligations and HUD suffered damages as a result of Guild's breach.

### d.  Time Bar

Guild asserts that the United States' breach of fiduciary duty claims arising prior to December 3, 2010, breach of contract claims arising prior to December 3, 2007, and FCA claims arising prior to December 3, 2007 are all time-barred.  Doc. No. 110-1 at pg. 44.

In response, the United States argues that its claims are timely.  Doc. No. 113 at pg. 43.  The United States contends that Guild has failed to meet its burden of conclusively showing that the United States' actions are "conclusively time-barred".  Id. at pg. 43.  The United States contends that Guild "does not identify the date that the responsible Government official(s) knew or should have known the facts material to the Government's claims."  Id. at pg. 44.  The United States asserts that the statute of limitations began to run when a false claim was submitted on an improperly underwritten loan, and not when Guild underwrote that loan."  Id.

There is limited case law on this topic within the Ninth Circuit.  In situations where the Ninth Circuit and Supreme Court have not given instruction, the Court will look to case law from other district courts.  Other courts have concluded "that the statute of limitations starts to run when a case claim is submitted to the government."  United States ex rel. Durkin v. County of San Diego, 2017 WL 3315784 (S.D. Cal. 2017).  Following that standard, the Court finds that the United States' period began to run when the false claim was submitted and not when Guild improperly underwrote the loan.  The Court finds that the United States' claims are not time-barred.

## **CONCLUSION**

Based on the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant Guild's Motion to Dismiss (Doc. No. 110) is **DENIED**.

**IT IS SO ORDERED**.

DATED: September 11, 2019

JOHN A. HOUSTON
United States District Judge

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel.<br>Michelle Calderon, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16-cv-00920-RLY-MJD |
| | ) | |
| CARRINGTON MORTGAGE SERVICES,<br>LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| ───────────────────────── | ) | |
| | ) | |
| MICHELLE CALDERON, | ) | |
| | ) | |
| Relator. | ) | |

**ENTRY ON DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND
AMENDED COMPLAINT**

Michelle Calderon ("Calderon") alleges Carrington Mortgage Services, LLC

("Carrington") violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., by

fraudulently approving loans for federal insurance that did not meet certain underwriting

requirements established by the Department of Housing and Urban Development

("HUD").  The court dismissed her amended complaint without prejudice for failure to

meet the requirements of Rule 9(b).  Calderon filed a second amended complaint, and

Carrington now moves for dismissal again.  For the reasons set forth below, the court

**DENIES** Carrington's motion.

## I.     Background

The parties are familiar with the facts alleged in this case—which are fully explained in the court's order on Defendant's previous motion to dismiss and hereby incorporated into this order.  (*See* Filing No. 75, Order on Defendant's Motion to Dismiss at 3 – 11).  For the purposes of deciding this motion, the court will only summarize the main allegations in Plaintiff's second amended complaint.

### A.     Factual Background

Carrington is a mortgage lender that operates various mortgage loan servicing centers.  (*See* Filing No. 79, Second Amended Complaint at 22 ¶ 12).  As part of its operations, Carrington underwrites and approves loans that are federally insured by the Federal Housing Administration ("FHA"), a division of HUD.  (*Id.*).  Carrington is considered a Direct Endorsement Lender under FHA's Direct Endorsement Program. (*Id.* at 22 – 23 ¶¶ 13 – 15; 30 ¶ 37).  A Direct Endorsement Lender is a lender that has been approved by FHA to underwrite and approve loans for FHA insurance without prior review by HUD.  (*Id.* 23 ¶ 15).  Direct Endorsement Lenders are responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the loan.  (*Id.* ¶ 18).

HUD imposes certain requirements on Direct Endorsement Lenders because of their preferred status.  Direct Endorsement Lenders are required to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity throughout the loan origination process.  (*Id.* ¶ 17).  HUD also requires that they ensure their underwriters comply with all applicable HUD regulations, policies, and procedures.  (*Id.* at 23 – 24 ¶

2

18).  Specifically, HUD requires that Direct Endorsement Lenders ensure that their underwriters can detect fraud and exercise due diligence when underwriting a loan.  (*Id.* ¶¶ 19 – 21).

Direct Endorsement Lender's underwriters may underwrite loans in two different ways: manually or by using a HUD-approved automated underwriting system ("AUS").  (*Id.* at 25 ¶ 24).  All HUD-approved AUSs operate in conjunction with the Technology Open to Approved Lenders Mortgage Scorecard ("TOTAL")—a credit evaluating algorithm maintained by FHA.  (*Id.* ¶ 25).  When considering a loan application, underwriters enter different variables into the AUS, and the system produces one of two different ratings for the loan: an "accept/approve" rating or a "refer" rating.  (*Id.* at 26 ¶ 26).  Those that get an "accept/approve" rating are subject to less stringent documentation standards.  (*Id.*).  On the other hand, those that get a "refer" rating must be manually underwritten and are subject to heightened documentation requirements and underwriter scrutiny.  (*Id.*).

In addition to approving new loans, Carrington also is authorized to approve pre-existing loans for refinancing.  (*Id.* at 27 ¶ 30).  HUD imposes additional requirements on Direct Endorsement Lenders for these loans.  (*Id.* ¶ 31).  One of these requirements is that the lender verify that the borrower is current on the existing loan.  (*Id.* ¶¶ 30, 31).

For each loan approved—new or existing—Direct Endorsement Lenders are required to make certain certifications.  They must certify that the mortgage loan complies with HUD's rules and is eligible for mortgage insurance, the data supplied for

each loan underwritten using an AUS is accurate, and a representative has personally reviewed all accompanying mortgage documents.  (*Id.* at 28 ¶¶ 32, 33).

Calderon formerly worked at Carrington as an underwriter.  (*Id.* at 22 ¶ 11).  She brought this *qui tam* action on behalf of the United States alleging that Carrington committed multiple counts of fraud under the FCA.  (*Id.* at 2 ¶ 5).  Calderon filed her complaint as relator on April 25, 2016, and after the United States declined to intervene, the court unsealed it.  (Filing Nos. 1, 11).  Calderon amended her complaint, and Carrington then moved to dismiss the amended complaint for failure to state a claim on July 21, 2017.  (Filing No. 48).

## B.    The Court's Order on Defendant's Previous Motion to Dismiss

The court granted Carrington's motion to dismiss Calderon's Amended Complaint finding that Calderon failed to sufficiently allege falsity, scienter, or materiality with respect to her FCA claims.  (Filing No. 75, Court's Order on Defendant's Motion to Dismiss at 11 – 18).

As to falsity, the court found Calderon failed to sufficiently plead all three of her theories under the FCA.  First, the court found that her claims for false certifications were inadequate because she never connected a single loan to a specific fraudulent underwriting practice performed by a specific individual.  (*Id.* at 12).  Second, her claims that Carrington manipulated the data entered into the AUS were likewise inadequate because she did not connect any employee who allegedly manipulated the data with any defaulted loan or claim for reimbursement.  (*Id.* at 13).  And finally, the court found that her claims for self-reporting violations were inadequate because Calderon failed to allege

4

any connection between a violation and a subsequent default that required the government to pay Carrington.  (*Id.* at 14)

As to scienter, the court found that Calderon's allegations were too conclusory. (*Id.*).  Specifically, the court explained that more details were necessary to support an inference that Carrington knowingly falsified data for hundreds or thousands of loans. (*Id.* at 15).

Lastly, as to materiality, the court found that Calderon failed to allege that the violations committed by Carrington were material.  (*Id.* at 17 – 18).  The court noted that Calderon failed to provide examples of regulatory and guideline violations that HUD has considered material in other cases.  (*Id.*).  And, like the other two elements, the court explained that Calderon failed to provide facts from which an inference can be drawn that the violation was material to any decision by HUD.  (*Id.* at 18).

The court, however, did grant Calderon leave to amend her pleading, and she responded by filing a Second Amended Complaint.

### C.    Additional Allegations in the Second Amended Complaint

Calderon added significant details in the Second Amended Complaint related to four allegedly fraudulent loans. (Filing No. 79, Second Amended Complaint at 3 – 19 ¶ 6); (*see also* Filing No. 91-11, Document Comparing Differences Between Complaints). With respect to these four loans, she provided various allegations that Carrington underwriters failed to verify borrowers' information, failed to include all the pertinent debt and documentation when submitting the loan application through the AUS, failed to explain discrepancies between loan applications, failed to verify statements made by

5

borrowers, and failed to conduct due diligence investigations into borrowers'
applications.  (*See* Second Amended Complaint at 3 – 19 ¶ 6.).  She provides specific
examples and the context supporting these allegations.  (*See id.*).  She also details various
HUD policies that Carrington's conduct allegedly violates.  (*See id.* at 8).  Finally,
Calderon added an allegation that Carrington failed to properly submit loans for mortgage
insurance certification within thirty days and collected on these loans even though they
were not properly insured.  (*Id.* at 21 ¶ 10); (Document Comparing Differences at 19).

## II.     Legal Standard

Claims brought under the FCA must satisfy the heightened pleading requirements
of Rule 9(b).  *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836
F.3d 770, 775 (7th Cir. 2016).[1]  Rule 9(b) requires a plaintiff to "state with particularity
the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This means a
plaintiff must provide "'the who, what, when, where, and how: the first paragraph of any
newspaper story'" to avoid dismissal for lack of particularity.  *United States ex rel.
Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) (quoting *DiLeo v. Ernst &
Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

---

[1] Carrington moves to dismiss the complaint for failure to plead fraud with particularity under
Rule 9(b) and for failure to state a claim under Rule 12(b)(6).  However, a complaint that
satisfies the heightened requirements of Rule 9(b) necessarily satisfies the requirements of Rule
12(b)(6).  *Id.* n. 21 (citation omitted).

III. **Discussion**

A. **The False Claims Act**

The FCA is "'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006) (quoting *United States v. Neifert–White Co.*, 390 U.S. 228, 232 (1968)). Calderon brings her claims under sections 3729(a)(1)(A) and (B), which impose liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B); *see also Hanna*, 834 F.3d at 778. To sustain a claim under those sections, Calderon must allege (1) that Carrington made a statement in order to receive money from the government, (2) that the statement was false, and (3) that Carrington knew the statement was false. *Id.* (citing *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011)).

Two theories are relevant to her claims: (1) fraudulent inducement or promissory fraud and (2) false certification. *Hendow*, 461 F.3d at 1171; *see also United States v. Wells Fargo Bank, N.A.*, 972 F. Supp.2d 593, 622 – 24 (S.D. N.Y. 2013). Under a fraudulent inducement theory, liability attaches where a defendant uses false statements or fraudulent information to induce the government to extend a benefit. *Wells Fargo Bank*, 972 F.Supp.2d at 623 ("[C]ourts have repeatedly held that the use of fraudulent information to induce the government to provide a loan guarantee or other contract constitutes a false claim under the FCA.") (internal quotations and citations omitted);

*United States v. Eghbal*, 548 F.3d 1281, 1283 – 84 (9th Cir. 2008) (collecting cases); *see also United States ex rel. Main v. Oakland City University*, 426 F.3d 914, 916 – 17 (7th Cir. 2005).

Under a false certification theory, liability attaches where a defendant makes a false representation of compliance with a federal statute, regulation, or contractual term as a condition to government payment.  *Wells Fargo Bank*, 972 F.Supp.2d at 622; *Hendow*, 461 F.3d at 1171 ("Many different courts have held that a claim under the [FCA] can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment.") (citations omitted).  A plaintiff ordinarily must show that the defendant made a false claim, the claim was made knowingly, the false claim was material to the government's decision to pay the claimant, and the claim was paid or approved by the government.  *Hendow*, 461 F.3d at 1172 – 73; *see also Universal Health Servs. Inc. v. United States*, 136 S.Ct. 1989, 2001 (2016).

## B.  Discussion

Calderon's Second Amended Complaint adequately alleges violations of the FCA under either theory.  With respect to fraudulent inducement, she alleges Carrington routinely approved loans for government insurance that clearly did not meet the underwriting requirements.  (Second Amended Complaint at 3 ¶ 6).  Carrington approved certain loans even though the files were missing pay stubs, bank statements, W-2s, gift letters, and payoff verifications—all in violation of HUD's requirements.  (*Id.*).  She also alleges Carrington failed HUD's due diligence requirement by approving new loans where documents were inconsistent with one another and refinanced loans where the

8

borrower was delinquent.  (*Id.*).  Worse—Calderon alleges that Carrington underwriters manipulated the data in the AUS in order to get a loan approved when the loan otherwise was not eligible for insurance by re-running the loan through the AUS multiple times over a short period.  (*See id.* at 5 – 6; 19 – 20 ¶¶ 8, 9).  These allegations, if true, show that Carrington fraudulently used false information in order to secure insurance on loans that it knew were otherwise ineligible for insurance—which is sufficient to state a claim under the FCA.  *Wells Fargo Bank*, 972 F.Supp.2d at 624 (finding government stated a fraudulent inducement claim where lender applied for insurance on mortgages even though lender failed to verify borrower's income and failed to analyze the borrower's investment history and negative credit history); *United States v. Academy Mortgage Corporation*, No. 16-cv-02120, 2018 WL 4053484, at *11 (N.D. Cal. Aug. 24, 2018) (finding government stated a claim under the FCA where lender allegedly overrode endorsement conditions, manipulated data in order to get an otherwise unqualified loan to qualify, hid adverse documentation, and incentivized underwriters to facilitate the making of bad loans).

With respect to false certification, her underwriting allegations likewise state a claim under the FCA.  *Wells Fargo Bank*, 972 F.Supp.2d at 624 (finding reckless underwriting claim properly understood as a false certification claim).  HUD requires a Direct Endorsement Lender for each loan to certify (1) the integrity of the data supplied by the lender and (2) that a representative personally reviewed the mortgage loan documents, closing statements, applications for insurance, and all accompanying documents.  (Second Amended Complaint at 28 ¶¶ 32, 33).  HUD also requires that the

lender certify that the mortgage complies with the underwriting requirements established by HUD. (*Id.*). These certifications are important because a lender must satisfy certain requirements before getting paid when the loan defaults. *See Wells Fargo Bank*, 972 F.Supp.2d at 624 (citing 24 C.F.R. § 203.255). They also reinforce that the lender has complied with the due diligence requirements established by HUD. (Second Amended Complaint at 24 ¶ 21). Consistent with the allegations above, Calderon alleges that Carrington made knowingly false certifications to obtain insurance on loans. (*Id.* 29 ¶ 35). These allegations are enough to state a claim under the FCA. *Wells Fargo Bank*, 972 F.Supp.2d at 624 (finding government stated a false certification claim where it alleged lender made false certifications in connection with obtaining insurance for home mortgages); *Academy Mortgage*, 2018 WL 4053484 at * 10 – 12 (same).

Carrington argues that Calderon's Second Amended Complaint improperly relies on material learned through discovery, and so the court should disregard any information Calderon learned through discovery. *See e.g. United States ex rel. Lusby v. Rolls-Royce Corp.*, No. 1:03-cv-0680, 2007 WL 4557773, at *8 (S.D. Ind. Dec. 20, 2007) (noting plaintiffs are not entitled to ticket to the discovery process in order to meet 9(b)'s particularity requirement). Once that information is stripped away from the complaint, Carrington argues, Calderon's complaint is virtually the same as before, and so the court must dismiss it again.

First, the rule against using discovery applies when the plaintiff files a bare-bones complaint and then seeks to learn *all* the relevant information through discovery. *See e.g. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 789 (4th Cir. 1999) ("The

10

clear intent of Rule 9(b) is to eliminate fraud actions in which *all* the facts are learned through discovery after the complaint is filed.") (internal quotations and citations omitted) (emphasis added); *see also United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 380 (4th Cir. 2008) (noting Rule 9(b) seeks to prevent claims that would have to rest *primarily* on facts learned through discovery) (emphasis added). In her original, Amended Complaint, Calderon alleged most, if not all, of the relevant facts to support her claim: she alleged—by name—some of the employees who allegedly approved loans for government insurance that did not meet the applicable requirements (Filing No. 40, Amended Complaint at 3 ¶ 6); she alleged that this occurred from 2013 through 2015 (*Id.*); she alleged that Carrington manipulated information in the AUS to get favorable results and that Carrington falsely certified compliance with HUD's requirements (*Id.* at 14 – 17); and she alleged that these allegations occurred in Carrington's operations centers (*Id.* at 6). Therefore, her complaint already contained many of the salient factual allegations, and her additional allegations were simply contextual details.

Second, Calderon added details to her complaint because the court found her Amended Complaint lacked specificity. The court explained that Calderon failed to connect any fraudulent underwriting practice to any specific person or specific mortgage nor did Plaintiff allege any factual allegations connecting fraudulent loans to claims for reimbursement from the government. (*See* Court's Order at 13).

However, upon review of the relevant case law, the court's position may have been too restrictive. Plaintiffs are not required—even under the heightened pleading

11

standards of Rule 9(b)—to plead *evidence* in their complaint.  *See Presser*, 836 F.3d at 783 (Hamilton, J. concurring in part and dissenting in part) (citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.*, 536 F.3d 663, 668 – 69 (7th Cir. 2008)).  Nor are they required to present specific claims for payment at the outset of the suit.  *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 – 55 (7th Cir. 2009) (reversing district court that dismissed complaint for lack of particularity).[2]  Plaintiffs are also not required to plead *why* the representations were false, or even prove that the representations were, indeed, false.  *Hanna*, 834 F.3d at 780 ("[W]e have never demanded that a plaintiff explain in her complaint *why* the claim was false.") (emphasis in original) (citations omitted); *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) ("Rule 9(b) does not require a plaintiff to demonstrate that a representation was indeed false.") (citation omitted).

Moreover, as an underwriter, Calderon would not have access to all of Carrington's loan files, and so the requirement of connecting a specific loan (that defaulted) to a specific claim submitted by Carrington for reimbursement may have been unwarranted.  *Lusby*, 570 F.3d at 854 (noting a requirement that the relator produce specific billing claims at the outset when such claims are in a defendant's possession would take a big bite out of *qui tam* litigation); *see also United States ex rel. Chorches for Bankruptcy Estate of Fabula v. American Medical Response, Inc.*, 865 F.3d 71, 86

---

[2] The district court in *Lusby* found that the complaint lacked particular allegations about specific contracts between Rolls-Royce and the Government, specific false claims submitted by Rolls-Royce to the Government, and specific deliveries by Rolls-Royce to the government.  *See Lusby*, 2007 WL 4557773 at *6.

(2nd Cir. 2017) ("An interpretation of Rule 9(b) that requires *qui tam* plaintiffs to plead billing details regarding the submission of specific false claims, even when knowledge of such details is peculiarly within the defendant's purview, would discourage the filing of meritorious *qui tam* suits that can expose fraud against the government."); *cf. Singer v. Progressive Care, SC*, 202 F.Supp.3d 815, 826 – 27 (N.D. Ill. 2016) (declining to apply a lower standard where relator was *chief operational officer* who would have had access to the materials documenting fraud) (emphasis added). Accordingly, since Calderon would not have had access to the specific details of the loans and alleged the key factual allegations in her Amended Complaint, the court declines to strike the additional details now espoused in the Second Amended Complaint.[3]

Carrington argues even if the additional details are considered, Calderon still fails to adequately plead the elements of falsity, scienter, and materiality. But, as explained above, her complaint satisfies all three of those requirements. She describes four specific loans that defaulted, the allegedly fraudulent underwriting practices, and the people allegedly involved with those practices. (Second Amended Complaint at 3 – 18). Even without the additional details, she identified four loan numbers that were allegedly ineligible for insurance due to fraudulent underwriting. (Amended Complaint at 3 ¶ 6).

---

[3] This court is not the only one to wrestle with how much information is needed to meet the particularity requirement of 9(b). *See In re HealthCare Compare Corp. Securities Litigation*, 75 F.3d 276, 285 (7th Cir. 1996) (Ripple, J. dissenting) ("Reasonable minds can—and will—differ on the adequacy of the factual specificity in an allegation of fraud."); *Presser*, 836 F.3d at 784 (Hamilton, J. concurring in part and dissenting in part) ("Too much? Too little? More "context"? What is a plaintiff to do? The best approach is to let the plaintiff try her best, and then to be liberal in allowing amendments . . . once the court has indicated what is necessary.").

She also alleges that Carrington falsely certified loans for insurance that were otherwise ineligible. (Second Amended Complaint at 30 ¶¶ 37, 38). Contrary to Carrington's position, Calderon does identify the policies and regulation alleged to have been violated. (*Id.* at 24 ¶¶ 18 – 21). This is enough to allege a false claim under the FCA. *See e.g. Wells Fargo Bank*, 972 F.Supp.2d at 624.

With respect to scienter, general allegations combined with her allegations of the fraudulent scheme suffice at this stage in the proceedings. Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *see also Hefferman*, 467 F.3d at 601. And as to materiality, Calderon has alleged that Carrington participated in the Direct Lender Program, Direct Endorsement Lenders are required to certify compliance with HUD's regulations and policies, and Carrington skirted its responsibilities by recklessly approving loans that were ineligible for insurance and falsely certifying compliance with HUD's regulations. These allegations suffice to show that Carrington's alleged fraudulent practices were material to HUD's decision to pay insurance on defaulted loans. *See. e.g. Academy Mortgage*, 2018 WL 4053484 at *11 – 12; *see also United States v. Quicken Loans Inc.*, 239 F.Supp.3d 1014, 1039 – 40 (E.D. Mich. 2017) (holding Direct Endorsement program requirements are material because they go to the heart of the bargain between HUD and the lender).

One final comment: just because Calderon has sufficiently *alleged* Carrington violated the FCA, that does not mean that she has adequately *proven* those allegations. *Lusby*, 570 F.3d at 855. Calderon may not have sufficient *evidence* of her allegations, or Carrington may have evidence that is uncontroverted and shows it is entitled to judgment

as a matter of law. Those questions can be answered later. Now, the court is only saying that Calderon has done enough to survive a motion to dismiss.

## IV. Conclusion

For the reasons set forth above, Carrington's motion to dismiss (Filing No. 90) is **DENIED**. Calderon's motion for oral argument is **DENIED AS MOOT**. (Filing No. 102). The dispositive motion deadline, which was stayed by order of this court, shall be forty-five days from the date of this Entry. The deadline for any party wishing to limit or preclude expert testimony shall be set later.

**SO ORDERED** this 22nd day of January 2019.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.